898

THE STATE OF WASHINGTON, *Respondent*, v. OWEN GARY MARTEN, *Appellant*.*

*Kempton, Savage & Gossard*, by *Anthony Savage, Jr.*, for appellant (appointed counsel for appeal).

*Charles O. Carroll* and *Edmund P. Allen*, for respondent.

LANGENBACH, J.†—Tammy Miley was a nurse working for a Seattle doctor who had the defendant as a patient. In November 1965, she began to keep company with defendant, although she was still married to a man in Detroit, who was seeking a divorce. She had in her custody a daughter, Becky, 1-year of age. By Christmas she and defendant had agreed to get married when it was possible and commenced to live together in her apartment. In a short time she became pregnant.

In the meantime, her husband came to Seattle and surreptitiously abducted the child and returned with her to Michigan. Mrs. Miley desired to contest the child's custody and asked defendant to leave her apartment lest her husband send a detective to try to prove she was an unfit mother. She also requested defendant to get her some funds

*Reported in 441 P.2d 520.

---

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

to use to go to Detroit and fight the custody matter. He agreed to do so and borrowed money from various sources. His then roommate loaned him $250, including two $50 bills.

She wanted him to get a gun to use for her own safety while in Michigan. This he did at a Seattle pawnshop — a .380 Star semi-automatic. In addition, she sought funds from him to pay for an abortion so that her condition of pregnancy would not mitigate against her.

In February she began to date another man, Wallace Clark, who was stated to be her cousin.

On April 26, 1966, about 5:30 p.m., defendant went to the doctor's office where Mrs. Miley was employed and gave her the $250, which included two $50 bills. (A co-worker testified Mrs. Miley had shown her the money and she observed two $50 bills.) Mrs. Miley left the office about 6 o'clock in the evening with Wallace Clark. He accompanied her to her apartment and then left immediately after agreeing to return about 8:30 p.m.

About 7 o'clock that evening defendant went to her apartment, but she was not there. He then went to the home of their mutual friend, Mrs. Dilnik. He appeared to be quite nervous and wanted to talk to her in private. In order to do so they went into another room where he inquired about Mrs. Miley's relations with Wallace Clark and her state of health. Mrs. Dilnik told him Mrs. Miley had been hemorrhaging as the result of a miscarriage the previous day—so an abortion was no longer necessary. She also informed him Wallace Clark was not related to Mrs. Miley. Defendant then left and returned to the victim's apartment.

While the defendant was at the doctor's office earlier that evening, Mrs. Miley had asked him to bring the gun to her apartment as she planned to leave for Detroit the next day and wanted to have it with her.

Upon his arrival at her apartment with the gun he found her in. She asked him about the gun and he explained its workings to her and stated it had cartridges in the maga-

zine. In demonstrating the mechanism to her, he had inserted one cartridge into the barrel, so that the gun was "loaded" but considered on safety. The gun was then laid in this condition on the table in the room.

He told her he had just come from Mrs. Dilnik's home and began to question her about her relationship with Wallace Clark. She still insisted he was only a cousin. He inquired about her supposed abortion and her need of money for it when he had been informed that she had had a miscarriage the day before. She seemed to get angry about this conversation with Mrs. Dilnik. She opened her wallet and returned the $250 to him. He asserted he was not angry with her, but when he started to leave she told him to wait while she telephoned Mrs. Dilnik to straighten out the matters about Clark and the miscarriage. He stopped and stood in the room between the apartment door and the table.

She sat on the davenport while she dialed the Dilnik number. A boy answered the telephone and stated his mother was out, but he sent his brother to get her. While waiting, the victim became more and more angry and talked louder until she finally slammed down the receiver. During this interval the defendant had taken the gun from the table and held it in his hand at his side. After she slammed down the receiver, she started to get up from the davenport as if to come towards him. He said he started to raise his hands to ward her off and "the gun cocked and evidently went off." Two tenants, one in the adjoining apartment, testified that they heard loud voices, the woman's loud and clearer, and the man's lower in tone, just before hearing four shots in rapid succession.

The next thing defendant heard her saying "oh" and he saw her lying on the floor with blood oozing from the front of her dress. He said he had no memory of firing any of the four shots. After he saw her lying on the floor he left the apartment, went down and got into his automobile and by devious route went to Tacoma that night.

(Later he wandered about the United States. He pawned the gun in Miami and finally in Texas, in June, he gave

himself up to an FBI agent, who checked with Seattle to determine whether he was wanted. Subsequently he was extradited and returned to Seattle for trial on a charge of murder in the first degree.)

About 9 o'clock on the night of the homicide, Clark returned to the apartment which he found locked. He went to the manager's office and got him to unlock the door. The manager went to the apartment, opened the door and saw the deceased lying on the floor. He then called the authorities to investigate the matter.

The coroner's testimony showed that each of the four bullets would have been fatal and described the succession in which the shots were evidently fired into her body. Two bullets were recovered and police tests showed that they came from the weapon involved in the shooting. The gun had been retrieved from Miami and was traced to its purchase by defendant in Seattle prior to the fatal shooting.

One officer testified that one bullet had ricocheted from the floor where it carved a slight groove as it glanced from the wood. This seemed to indicate that the last shot through her head had been fired at such an angle which would cause the bullet to glance from the floor surface instead of piercing it as would have occurred had the shot been fired more directly at the floor.

The jury returned a verdict of guilty of murder in the second degree by use of a weapon. From the judgment and sentence pronounced on the verdict, the defendant has appealed.

He cited five errors in the giving of one instruction and the failure to give four of his proposed instructions. These assignments are all argued together. He stated the only issue before the court is whether the defense of excusable homicide should have been submitted to the jury for its consideration.

The court gave the following instruction to which exception was taken:

The killing of another is excusable when committed by accident or misfortune in doing any lawful act by lawful

means with ordinary caution and without any unlawful intent.

You are instructed that under the evidence in this case, the killing of Mrs. Janet Presson, also known as Tammy R. Miley, was not excusable. (Instruction No. 12.)

The four proposed instructions of the defendant related to some phases of excusable homicide. He contended that where his asserted defense was excusable or accidental homicide, he was entitled to an instruction according to his theory of defense.

What was said in *State v. Biondic*, 47 Wn.2d 593, 594-95, 288 P.2d 845 (1955), is decisive here:

Instructions on justifiable homicide and self-defense were refused. There being no evidence from which the jury could have found that the killing, which was admitted, was either excusable or justifiable homicide as those terms are defined in our statutes (Laws of 1909, chapter 249, §§ 152, 154, pp. 933, 934 (Rem. Rev. Stat., §§ 2404, 2406 [*cf.* RCW 9.48.150, 9.48.170])), the trial court properly refused to give the requested instructions, and just as properly gave an instruction that, as a matter of law, the killing was neither justifiable nor excusable. *State v. Hartley* (1946), 25 Wn. (2d) 211, 226, 170 P. (2d) 333.

*Accord, State v. Griffith*, 52 Wn.2d 721, 328 P.2d 897 (1958). The rule is also stated in 41 C.J.S. *Homicide* § 387 at 195:

However, a failure or refusal to give instructions on the law of excusable homicide by reason of accident is not error, where there is not sufficient evidence in the case on which to rest such defense, as where the physical facts themselves contradict such a contention, . . . . (Footnotes omitted.)

This rule has also been applied where the requested instruction dealt with manslaughter.

While an instruction on manslaughter should be given if there is any evidence on which a jury could reach such a verdict, a manslaughter instruction where there is no evidence to support such a verdict is confusing and should not be given. *State v. Moore*, 61 Wn.2d 165, 377 P.2d 456, headnote 5 (1963).

The evidence showed that the defendant was 5 feet 8 inches tall and weighed 165 pounds, and Mrs. Miley was 5

feet 3 inches tall and weighed about 105 pounds. While Mrs. Miley was sitting on the davenport telephoning, she became angry with the defendant. She had just started to get up when he raised his hand with the gun in it and fired four shots in rapid succession into her body. There were no powder burns on Mrs. Miley's clothes, showing that she and the defendant were more than 3 feet apart.

The gun required a 3-pound pull on the trigger to activate each shot. The fact that the last shot richocheted and glanced from the wood floor would almost conclusively demonstrate that this shot was fired at a slight angle in order to make the bullet glance and leave a slight dent or groove in the wood. That fact in itself might have provided the necessary moment of premeditation to resolve this into a premeditated murder instead of the lesser degree of which the defendant was convicted.

The judgment and sentence is affirmed.

FINLEY, C. J., HILL, HAMILTON, and NEILL, JJ., concur.