[No. 39640. Department Two. May 29, 1968.]

THE STATE OF WASHINGTON, *Respondent,* v. THEODORE V. BARNHART, *Defendant,* JAMES HOWARD LEUPP, *Appellant.*[*]

*Robert I. Bounds,* for appellant (appointed counsel for appeal).

*Joseph Panattoni,* for respondent.

[*]Reported in 442 P.2d 959.

LANGENBACH, J.†—Appellant and two other young men were charged with murder in the first degree, committed in Kittitas County. One defendant was allowed to plead guilty to a lesser offense, and one was dismissed at the close of the trial. Appellant was convicted of murder in the second degree and has appealed.

Appellant and the two other defendants, Barnhart and Fritsch, worked together on a beet farm. The victim, Robert Thompson, had also worked there but had recently been discharged. On the evening of November 1, 1965, the defendants drove around in Fritsch's automobile, drinking beer. Later, they picked up two girls and drove farther about the county and drank more beer until about 3:30 the next morning. They let the girls out at their apartment, and drove to the hotel where Thompson had a room.

Appellant went up to the room and persuaded Thompson to come down to the automobile for some beer. This was about 4 o'clock the same morning. Thompson went with them and appellant drove out into the country. Barnhart and Fritsch were under the influence of beer, or asleep, while appellant and Thompson discussed some petty matters. The argument between them waxed warmer, and finally the two got out of the automobile to fight. Thompson struck the first blow and knocked appellant down. He got up and beat Thompson with his fists about the head and face, and also kicked him.

When the fighting was over, appellant helped Thompson to his feet and they got into the car. Appellant wanted to take him to the doctor because of his beaten and bloody condition, but Thompson objected to any assistance from appellant. So appellant drove farther out into the valley and let Thompson out at the side of the road and drove back to town, with the other two defendants still in the automobile, but apparently oblivious to what had transpired.

---

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

Appellant drove to the girls' apartment about 7 o'clock and awakened one of them. He asked her for a pan of water and a rag to wipe blood off the car. She complied with his request. Later, he and Barnhart told the girls that they had killed a doe deer; that that was the cause of blood on the car; that the game warden had seen them, and that they were going to draw their pay from the beet farmer and leave that area. (Fritsch, the other defendant, was still asleep in the back seat of the car.) Appellant stated he did not want to get into any further trouble so he had asked Barnhart to go to Aberdeen with him and Barnhart agreed.

After taking Fritsch home, appellant and Barnhart drove out to the beet farmer and related their concocted story about shooting a deer and asked him for their pay. The farmer had them deliver a load of beets before he paid them, after which they returned to Ellensburg. They persuaded one girl to go along with them. They then gathered her personal belongings, and stopped to get their own personal things, and Barnhart's children, and started for Aberdeen late in the afternoon. On the way, they left the children with appellant's sister near North Bend.

They reached Aberdeen about 3 o'clock in the morning. They obtained one room for appellant and the girl, and another for Barnhart. The two men found employment in the lumber industry. They remained there until early the morning of November 8th, when a deputy sheriff and police came to the room and arrested appellant and the girl. The deputy sheriff advised appellant of his rights—the deputy had a "Miranda card" with him—before taking him to jail, and held the girl as a material witness.

After the arrest, the deputy prosecuting attorney for Kittitas County flew to Aberdeen to interview appellant in the city jail. He talked to appellant about 7:30 p.m. and advised him as to his rights under the Miranda decision. (*Miranda v. Arizona*, 384 U. S. 436, 16 L. Ed. 2d 694, 86 Sup. Ct. 1602 (1966). He had a copy of the Miranda decision with him at the time.) The police did not have a secretary, but the deputy sheriff had a tape recorder in his automobile. He procured it and set it up for use in the chief's office.

After having advised appellant of his rights again, the deputy prosecutor commenced his interrogation. This was started before the deputy sheriff turned on the tape recorder, so the first part of the interrogation and the prosecutor's final warning were not on the tape. (It is not known why the tape was not restarted.) The interview lasted about 15 minutes.

The next day, deputy sheriffs from Kittitas County arrived and took all three of the persons back to Ellensburg.

The trial court held a hearing to determine the sufficiency of the tape recording as an admission under CrR 101.20W. The Grays Harbor officers and the deputy prosecuting attorney testified about the recording of the interrogation on the tape. Appellant did not testify and the court found that the statement was voluntary and admissible.

At the trial, Fritsch was allowed to testify, but was not tried as his attorneys had agreed that he would plead guilty to being an accessory after the fact. Barnhart did not testify, and the case against him was dismissed for lack of evidence. Appellant did not testify.

There were 26 assignments of error directed primarily against instructions given and refused.

The information had alleged that the instrument used was an automobile lug wrench. When the evidence did not disclose the use of such an instrument, at the close of the case all reference to it was stricken.

Error was assigned to the admission of the tape recording. The statement of facts set forth that hearing in great detail. As there was no contradiction appearing, the trial court properly ruled that the statement was admissible as voluntarily and knowingly made. The appellant had been advised of his "civil rights" on four separate occasions prior to the making of any statement at all.

■ Another error is directed against the admission of a statement made by appellant to his wife, over the sheriff's telephone, in the presence of the sheriff's secretary. There was no testimony that the appellant objected to talking to his wife in the presence of the secretary. He saw her sitting

across the desk from him when the telephone connection had been made. A statement made in the presence of a third person, by a husband to his wife, loses its privileged character. If the communication is heard by a third person, even if an eavesdropper, the third person may testify to it, since the privilege protects only successful confidences. *State v. Thorne,* 43 Wn.2d 47, 260 P.2d 331 (1953). Consequently, the statement made, as related by the sheriff's secretary, was properly admissible.

A principal argument of error concerned the instruction setting forth the elements of murder in the first degree, murder in the second degree, and manslaughter, all in a single instruction. While this instruction appears cumbersome and somewhat inartistically drafted, it sets forth, seriatim, the elements involved in these three separate offenses. Appellant contends there should have been three separate instructions, such as he proposed, instead of one which encompassed the three components of one possible offense. Although such instructions would have been preferable, this instruction, as given, was reasonably understandable by the jury.

Error was assigned to instruction No. 11, which reads as follows:

> Under certain circumstances and conditions a homicide may be excusable or justifiable. None of such circumstances and conditions exist in this case, and I instruct you that, as a matter of law, excusable or justifiable homicide should not be considered.

In addition, appellant proposed several instructions on excusable, or justifiable homicide, and on manslaughter and assigned error to the court's failure to give them. These may all be considered together.

The rule is stated in 41 C.J.S. *Homicide* § 387:

> However, a failure or refusal to give instructions on the law of excusable homicide by reason of accident is not error, where there is not sufficient evidence in the case on which to rest such defense, as where the physical facts themselves contradict such a contention . . . .

*Accord, State v. Biondic,* 47 Wn.2d 593, 594-95, 288 P.2d 845 (1955); *State v. Marten, ante* p. 898, 441 P.2d 520 (1968).

The case of *State v. Moore,* 61 Wn.2d 165, 171, 377 P.2d 456 (1963) held:

> [I]f there is any evidence on which a jury could reach a verdict of manslaughter, such an instruction should be given. [Citations omitted.]
>
> . . . [But] there being no evidence to support a verdict of manslaughter, such an instruction is confusing and should not be given.

The evidence clearly showed that appellant was the aggressor. He went to the victim's room, persuaded him to come to the automobile for some beer, and drove him out into the country late at night, engaged him in an argument and then got out of the car and had this bloody fight. He helped him back into the car in a beaten and bloody condition, and, when Thompson objected to going to a doctor, drove him farther up the valley and left him standing by the roadside and returned to town.

The sheriff's secretary testified that she heard the appellant say, while telephoning his wife, in her presence:

> I heard Jim Leupp say he was in trouble, that he had had a fight with this guy, had beat him pretty bad and that he was dead and he had taken him up in the hills and dumped him.

There was no evidence whatsoever which would have justified the trial court in giving any instructions on excusable or justifiable homicide, or even manslaughter. This was at least murder in the second degree. This also disposes of the contention that the court erred in giving an instruction that the law presumes everyone to intend the natural and probable consequences of his own acts. And intent is a mental condition which may be shown by direct or indirect proof. There was nothing accidental—this was a deliberate and intentional set of circumstances generated by appellant himself. There was no error in connection with these instructions.

In the state's opening argument to the jury, the prosecuting attorney, in discussing the events leading up to the

tragedy, stated: "This defendant, in my opinion, has never shown any remorse for his act." This referred to the profane statements made by appellant at the time of the tape recording, and the fact that appellant left the decedent in a beaten and bloody condition up in the woods on a lonely road late at night. While the prosecutor's language was inappropriate, it was not inflammatory or prejudicial.

Appellant submitted 40 proposed instructions. Of these, eight pertained to Barnhart's connection with the crime. These became unimportant when the case against Barnhart was dismissed for insufficiency of the evidence to connect him with the crime. Eighteen were substantially duplicates of some given by the court and some others stressed various phases of appellant's contentions concerning the offense. A review of the entire record and file disclosed that the essential elements of a crime of this magnitude had been adequately covered by the instructions given to the jury. There was no error in this respect.

A more serious question raised by appellant concerned the court's failure to give his proposed instruction No. 21, to which proper exception was taken. That instruction reads:

As used in these instructions, the term 'proximate cause' means that cause which in a direct, unbroken sequence produces the event complained of and without which such event would not have happened. When we say that an act or omission must be a proximate cause of an event, we mean that the event must be the natural and probable consequence of the act or omission and one which would have been foreseen by a man of ordinary prudence and intelligence, though not necessarily in the precise form in which it occurred. The proximate cause is the direct, producing, efficient cause. There may be one or more proximate causes of a particular event.

The autopsy surgeon testified in considerable detail as to the extent of decedent's injuries. He stated that death resulted from a subdural hematoma on the right side. He could not determine which facial injury produced death, nor could he state how long after the injuries had been inflicted that death would ensue.

In addition there was the statement appellant made to his wife over the telephone in the presence of the sheriff's secretary that "he was in trouble. He had a fight with a guy. That he had beat him pretty bad. That he was dead and took him to the hills and dumped him." (We have ruled this statement admissible under the authority of *State v. Thorne, supra.*)

It was argued that decedent's body was discovered at a place different from where appellant had let him out of the automobile. But there was no testimony to substantiate this assertion. The doctor testified he could not state definitely how much time would elapse from such a severe beating until death would follow. There was no proof of any possible intervening cause between the brutal assault and the subsequent death.

Consequently there was credible proof from which the jury could conclude that the attack by appellant was the sole cause of the death of the victim. By the statements in his admission to the officers and in his telephonic conversation with his wife, appellant furnished the logical and conclusive basis for the jury's verdict. There was not a single bit of evidence to the contrary. The appellant has had a fair trial represented by capable counsel.

The judgment and sentence is hereby affirmed.

FINLEY, C. J., HILL and NEILL, JJ., concur.

HAMILTON, J., concurs in the result.

---

September 26, 1968. Petition for rehearing denied.