[No. 2954–2. Division Two. November 15, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. DAVID
JELLE, *Appellant.*

*John L. Farra,* for appellant (appointed counsel for appeal).

*Curtis M. Janhunen, Prosecuting Attorney,* for respondent.

SOULE, J.—Defendant appeals from a conviction of first–degree murder. We affirm.

Three assignments of error are presented. One, was it error to refuse to submit a self–defense instruction? Two, was it error to refuse to submit a manslaughter instruction? Three, was it reversible error to deny defendant release on bail pending trial?

Because the trial court decided as a matter of law that there was insufficient evidence to support the offered instructions on self–defense and manslaughter, we consider the evidence in the light most favorable to the defendant. *State v. Kerr,* 14 Wn. App. 584, 544 P.2d 38 (1975).

Defendant and the victim, John Bussard, had been friends for a number of years—such good friends that defendant had, by custom, free and unlimited access to the victim's home. In March of 1977, defendant and his wife Jean became estranged and defendant suspected that John Bussard was the cause. Defendant admitted that he was jealous. On March 31, 1977, he purchased a shotgun. Later

that same day, he entered the victim's home to search for telephone bills which might show calls from the victim to defendant's wife. He found evidence of calls to her place of employment in Olympia. He also found personal effects of his wife and son. Between March 31 and April 4, in the absence of the victim, he returned to the residence with the gun but then departed, taking the gun with him. Bussard had weapons in the house and defendant in explaining his actions stated that he did not intend to harm Bussard but suggested that he took his own gun in the hope of preventing a violent reaction from Bussard in the event of a confrontation about Jean. During the day of April 4, he returned to the house with his disassembled shotgun, put it under the couch in the library, and left. Later, he returned to search for more incriminating telephone bills. This search was successful. He also found his wife's coat in the closet. In the late afternoon or early evening, before the victim came home from work, defendant reentered the house, assembled his shotgun, went through the house, obtained one of the victim's pistols from his dresser and picked up a sheath knife from the stereo. He took them back to the library.

At this point he felt that he had picked up all of the firearms in the house. About this time, Bussard came home. Defendant waited silently in the library while Bussard worked in the garden, took a bath, ate dinner and received a telephone call from Ron Sharp. About 10 p.m., the victim received a call from Jean Jelle.

The only verbal evidence of what happened thereafter between the two men comes from the defendant. Defendant said that after the telephone conversation was well underway, he emerged from the library carrying the loaded shotgun but pointing the muzzle toward the floor. Bussard retreated to the bathroom. Then defendant assured Bussard he only wanted to talk about his wife and son. Bussard reappeared and a conversation ensued. Defendant said he saw Bussard reach across a table toward another handgun which defendant had overlooked. Defendant says

he warned Bussard not to move and fired only when the victim continued to move toward his gun. The shot knocked the victim back and the gun went to the floor in the kitchen near a doorway. The victim, although injured, attempted to retrieve his gun. Defendant fired again, hitting him in the left shoulder. This shot knocked the victim across the kitchen and he went down by the back door. Thinking that the victim was then stopped from going for his gun, defendant left the room intending to leave the house. As he started to leave, he heard a noise, came back to the kitchen and stated that he found Bussard on his right knee with the gun in his left hand. At another time, he said only that Bussard was reaching for the gun. Defendant said Bussard was turned with his head somewhat sideways, at which point the defendant fired again.

According to defendant, the first shot hit the right hand and the arm, the second hit the left shoulder and neck, and he was not sure where the third hit, although he contends that he was shooting for the shoulder.

The pathologist who examined the body testified that the shot which hit the right arm so damaged it that the right hand was disabled. The second shot to the left shoulder and neck fragmented the bone structure in the left shoulder and so damaged the lung that the wound would eventually have been fatal. However, he could not say that the left arm would be totally unusable immediately after the shot. He further testified that the third shot to the head was instantly fatal and that the direction of the third shot was from the back toward the front and slightly upward.

Detective Bertrand testified that six pellets of "00 Buckshot" were imbedded in the floor directly under what was left of the head. The pellets were retrieved and submitted to the State's criminologist, Ann Beaman. She testified that she examined the linoleum taken from under the head, it had six pellet holes in it, together with the blood, and that the six pellets taken therefrom contained head hairs but no fibers. Other pellets taken from other areas in the room did contain fibers which she concluded were from the victim's

shirt. The position of the body in relation to the physical evidence is demonstrated by exhibits 7, 9 and 47. ·

■ On these facts, the court correctly refused to give a self–defense instruction. One who is the aggressor, or provokes an altercation in which he kills another, cannot successfully invoke the right of self–defense to justify or excuse the killing unless he has withdrawn from the fray at a time and in a manner sufficient to clearly advise his adversary that he, in good faith, is desisting or intending to desist from further aggression. *State v. Craig,* 82 Wn.2d 777, 514 P.2d 151 (1973); *State v. Wilson,* 26 Wn.2d 468, 174 P.2d 553 (1946). *See also State v. Barnhart,* 73 Wn.2d 936, 941, 442 P.2d 959 (1968).[1]

From the outset, defendant's actions were those of an aggressor, but even putting aside the fact that the defendant armed himself and lay in wait for the victim and giving full weight to his declaration that he did not intend to kill the defendant when the episode began, the circumstances of the third and fatal shot destroy his theory of self–defense. With the victim grievously wounded, defendant had left the room intending to leave the house, yet on hearing a noise, he returned to the victim. Defendant's testimony that the victim was turned somewhat sideways to him and in the process of again reaching down for his gun is completely refuted by the shot pattern of that last shot, from the back of the head toward the front in a slightly upward direction with the pellets being imbedded in the linoleum immediately under the head. Despite the defendant's testimony, the physical facts lead to only one conclu-

---

[1]Appellant cites *State v. Alexander,* 7 Wn. App. 329, 499 P.2d 263 (1972) in support of his contention that a self–defense instruction should have been given. The case is not persuasive because the issue of whether or not such an instruction should have been given was not before the court. With great liberality, and to the defendant's benefit, the court did instruct on self–defense and of course defendant took no exception. *Cf. State v. Mriglot,* 88 Wn.2d 573, 578, 564 P.2d 784 (1977). Under the rationale of *State v. Craig,* 82 Wn.2d 777, 514 P.2d 151 (1973), it probably should not have been given.

sion. Beyond all doubt, the victim was shot in the back of the head while lying facedown on the kitchen floor.

■■ On the facts presented, we have no hesitancy in applying the rule that when physical facts are uncontroverted and speak with a force that overcomes all testimony to the contrary, reasonable minds must follow the physical facts and therefore cannot differ. *Bohnsack v. Kirkham,* 72 Wn.2d 183, 190, 432 P.2d 554 (1967); *Fannin v. Roe,* 62 Wn.2d 239, 243, 382 P.2d 264 (1963). That this rule may be applied in criminal cases to support the refusal of an instruction on self–defense or manslaughter is recognized by *State v. Marten,* 73 Wn.2d 898, 902, 441 P.2d 520 (1968) and *State v. Barnhart, supra* at 940.

■ Further, even if the deceased had been reaching for his gun either before or after the first two shots, he was justified in doing so and appellant cannot avail himself of a claim of self–defense. *State v. Craig, supra.*

Defendant assigns error to the failure to give a manslaughter instruction, but recognizes that if his contention regarding the self–defense instruction does not prevail, that neither will the contention concerning manslaughter. We hold that on the record before us, there is no evidence upon which to predicate a manslaughter instruction. *See State v. Farley,* 48 Wn.2d 11, 290 P.2d 987 (1955), *cert. denied,* 352 U.S. 858, 1 L. Ed. 2d 65, 77 S. Ct. 79 (1956).

Lastly, defendant asks for a new trial because he was denied bail pending his trial. It is defendant's contention that he was entitled to bail because first–degree murder under RCW 9A.32.030(1)(a) is not a "capital offense" under article 1, section 20 of the Washington State Constitution.

For the purpose of this decision we need not decide whether first–degree murder remains a capital offense in the constitutional sense, notwithstanding the fact that our legislature has now categorized it as a Class A felony. However, we do observe that the reasoning of *State v. Haga,* 81 Wn.2d 704, 504 P.2d 787 (1972) affords some support for·

878

the view that first–degree murder still remains a capital offense in the context of the Washington State Constitution.

 Assuming, however, that defendant was entitled to bail, refusal of bail does not warrant the granting of a new trial. A new trial should be granted only for error which presumptively affects the final result of a trial. *State v. Craig, supra* at 784. Defendant's assertion that because the improper denial of bail denies his constitutional rights he therefore need show no prejudice, is not supported by citation of authority and is in fact unsound. In *United States v. Stroud,* 474 F.2d 737, 738 (9th Cir.) *cert. denied,* 412 U.S. 930, 37 L. Ed. 2d 157, 93 S. Ct. 2759 (1973), the court held that the improper revocation of bail in the midst of trial was not ground for granting a new trial absent a showing of prejudice, particularly in view of the overwhelming weight of the evidence. The error was held to be harmless and we likewise hold that the error, if it was error, was harmless.

Moreover, we follow the view that review of the denial of bail pending trial cannot be raised after trial and conviction. *People v. Harris,* 38 Ill. 2d 552, 232 N.E.2d 721 (1967).

The conviction is affirmed.

PEARSON, C.J., and PETRIE, J., concur.