[No. 4109–3–III.   Division Three.   December 17, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. EUGENE
LAURENCE HANSEN, *Appellant.*

*Richard L. Cease, Public Defender,* and *Francis Conklin, Special Assistant,* for appellant.

*Donald C. Brockett, Prosecuting Attorney,* and *Leroy C. Kinnie, Deputy,* for respondent.

MUNSON, J.—We affirm Eugene Hansen's conviction for first degree manslaughter, holding there was no evidence to

support his requested instruction regarding second degree manslaughter.

Hansen occupied the upper half of a northwest Spokane duplex owned by Todd Browning. The basement half of the duplex was occupied by Shawn Dowd. Dowd had been informed by an acquaintance that some people were planning to break into his house. The burglars chose Dowd's house because they believed him to be a marijuana dealer. Aware of the impending burglary, Dowd and Hansen decided to apprehend the burglars. The two waited upstairs in the dimly lit duplex while the burglars knocked on doors and then kicked in a basement window. Dowd was armed with a .22 caliber rifle; Hansen with a single action .357 magnum handgun, which had been left in the duplex by Todd Browning.

Upon hearing the window break, Hansen ran downstairs, gun cocked, and burst into the room, pointing his gun at Kenneth Bigelow, who was then rummaging through a drawer. Hansen yelled, "freeze", and Bigelow complied. Hearing footsteps outside the window, Dowd gave chase, caught Matt Southwell, hit him over the head and dragged him inside. Meanwhile, Hansen ordered Bigelow to lie on the floor where he was joined by Southwell. Bigelow was yelling at Hansen, "I'm not going to rip you off," which angered Dowd, who perceived the statement to mean that Dowd, not Hansen, was the target of the burglary. Dowd pointed his gun at Bigelow, but Hansen calmed Dowd, who then kicked Bigelow as he left to check a nearby church parking lot where he thought the intruders had parked.

What happened next is the focus of this tragedy. Slightly different stories are told by Southwell, Hansen, and the mute testimony of Kenneth Bigelow's body.

Southwell testified Bigelow was mumbling something like, "Now that you caught us why don't you let us go?" Hansen kept telling him to shut up—and then shot him. Dowd came back into the room and asked him why Hansen shot Bigelow. Hansen said "He just wouldn't shut up, . . ." Dowd claims Hansen then said that Bigelow reached for the

gun and pushed him, and the gun went off.

Hansen testified that after Dowd left, Hansen searched the burglars' pockets. Bigelow kept a constant stream of talk directed at Hansen, pleading to be released. Hansen kicked Bigelow several times to keep him from getting up. Then Hansen said he was walking back and forth between the prone burglars to the window, keeping a lookout for Dowd. Bigelow was moving around and Hansen said he did not remember what happened next, except he thought Bigelow was getting up and reaching for the gun; he was bumped; and the gun went off. At trial, Hansen said he was frightened of the situation in the room, afraid the burglars might turn the tables on him. Hansen admitted that had he not been standing so close—almost touching Bigelow—the shooting would never have occurred.

The shooting did occur and Bigelow died from massive injuries caused by a .357 magnum bullet which passed through his head. Powder burns on the right temple indicated the bullet entered Bigelow's skull from right to left. The entrance wound on the right temple showed evidence of powder stippling which suggested the gun had been fired from 3 inches away. There were no powder burns around the exit wound on the left side of the head. The bullet then traveled almost straight down through Bigelow's right hand (which also showed no powder burns) and lodged in his left forearm. The physical evidence admits of only one conclusion: Bigelow lay on his left side, his head resting on his right hand, which in turn lay on his left forearm. Hansen stood with the gun directly over Bigelow's head while Bigelow's hands were under his head, and from a range of 3 inches, Hansen discharged the gun, killing Bigelow. Bigelow's hands could not have been in a position to push Hansen when the gun went off.

Of considerable importance is the nature of Hansen's gun. It was a single action .357 magnum revolver. Such a weapon must be cocked manually before firing, and when cocked, a relatively light trigger pull suffices to discharge the weapon. Hansen knew the gun had to be cocked and

did so before confronting the intruders. He had never fired the weapon before.

Hansen was charged with first degree murder. He was convicted of the lesser included offense of first degree manslaughter. The trial court refused to instruct the jury concerning second degree manslaughter. Hansen argues he was entitled to an instruction allowing the jury to find him guilty of the lesser included offense of second degree manslaughter. We disagree and affirm.

■ A defendant is entitled to an instruction on a lesser included offense if two conditions are met. First, each of the elements of the lesser offense must be a necessary element of the greater offense charged. Second, the evidence must support an inference that the lesser crime was committed. *State v. Workman,* 90 Wn.2d 443, 584 P.2d 382 (1978). As to the first condition, we must examine the nature of first and second degree manslaughter. As to the second condition, we must review the record to determine if sufficient evidence existed to justify the requested instruction.

First degree manslaughter is defined in RCW 9A.32.060, which states:

> (1) A person is guilty of manslaughter in the first degree when:
> (a) He recklessly causes the death of another person;
> . . .

Recklessness is defined in RCW 9A.08.010(1)(c) as:

> (c) . . . A person is reckless or acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation.

Second degree manslaughter is defined in RCW 9A.32.070 as:

> (1) A person is guilty of manslaughter in the second degree when, with criminal negligence, he causes the death of another person.

Criminal negligence is defined in RCW 9A.08.010(1)(d) as:

(d) . . . A person is criminally negligent or acts with criminal negligence when he fails to be aware of a substantial risk that a wrongful act may occur and his failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable man would exercise in the same situation.

A distinction between the two degrees of manslaughter is discussed in 2 C. Torcia, *Wharton on Criminal Law* § 168, at 272 (14th ed. 1979):

The difference between the terms "recklessly" and "negligently", . . . is one of kind, rather than of degree. Each actor creates a *risk* of harm. The reckless actor is *aware* of the risk and disregards it; the negligent actor is *not aware* of the risk but should have been aware of it.

(Footnote omitted.) *See also State v. Burley,* 23 Wn. App. 881, 598 P.2d 428 (1979); *People v. Strong,* 45 App. Div. 2d 18, 356 N.Y.S.2d 200 (1974), *rev'd on other grounds,* 37 N.Y.2d 568, 338 N.E.2d 602, 376 N.Y.S.2d 87, 78 A.L.R.3d 1125 (1975); *People v. Cruciani,* 70 Misc. 2d 528, 334 N.Y.S.2d 515 (1972).

The crucial difference between the discussion in *Wharton on Criminal Law* and RCW 9A.08.010(1)(d) is the inclusion in the former's definition of negligence that the actor was unaware of the risk but should have been aware of the risk. That is an objective standard, *i.e.,* a reasonable person in the position of the defendant would have perceived the risk. The *Wharton* interpretation applies to RCW 9A.08-.010(1)(d); the defendant's knowledge or lack thereof is to be measured by what the jury would expect a reasonable person to know in the defendant's situation.[1]

---

[1]This objective standard is required under RCW 9A.08.010(1)(d) which requires that the failure to be aware of a risk is itself a gross deviation from the standard of care a reasonable person would exercise in the situation. In other words, a reasonable person would be aware of the risk. As stated in *People v. Cruciani, supra* at 535:

[T]he elements of the crime 'preclude the proper condemnation of inadvertent risk creation unless "*the significance of the circumstances of fact would be apparent to one who shares the community's general sense of right and wrong*"'."

Such a result seems to be required in a situation such as this, since the jury must

■ It is clear that second degree manslaughter is a lesser included offense to first degree manslaughter. They share the same elements except for negligence and recklessness, and negligence is deemed a lesser included mental state to that of recklessness pursuant to RCW 9A.08.010(2). *State v. Jones,* 95 Wn.2d 616, 628 P.2d 472 (1981); *State v. Burns,* 20 Wn. App. 72, 578 P.2d 554 (1978).[2]

■ The question here is whether there is sufficient evidence to require an instruction on second degree manslaughter. There must be evidence in the record which will support an inference that the lesser crime was committed. *State v. Workman, supra.* The evidence must be of a nature to convince a reasonable person that the lesser offense occurred. *State v. Jimerson,* 27 Wn. App. 415, 618 P.2d 1027 (1980). If there is insufficient evidence to sustain the jury in finding the lower charge, no instruction should be given. *State v. Moore,* 61 Wn.2d 165, 172, 377 P.2d 456 (1963). Hansen claims he was unaware of the risk his conduct created. We find this argument inadequate.

■ First, when uncontroverted physical evidence speaks with a force sufficient to overcome contrary testimony, reasonable minds cannot differ, and the physical facts must be followed. *Bohnsack v. Kirkham,* 72 Wn.2d 183, 190, 432 P.2d 554 (1967). This rule has seen application in Washington, primarily in cases where courts have refused self-defense instructions because physical evidence establishes the defendant was the aggressor. *State v. Jelle,* 21 Wn.

---

rely on objective evidence to attempt to determine the intent of the parties. To make the issue of knowledge entirely subjective would be to provide an immutable defense to any of the higher degrees of intent based upon the defendant's mere assertion that he did not understand the nature of the risk undertaken. *People v. Strong,* 37 N.Y.2d 568, 338 N.E.2d 602, 376 N.Y.S.2d 87, 78 A.L.R.3d 1125 (1975).

[2]Another way to look at the hierarchy of crimes is that to prove manslaughter in the second degree, it is necessary to show that death has been caused, that a person acted in a way that created a substantial risk and that he should have been aware that his conduct created the substantial risk. To prove manslaughter in the first degree, those same elements must be shown, and in addition, it must be shown that the actor did perceive the risk and proceeded in spite of his perception.

App. 872, 587 P.2d 595 (1978). *See also State v. Barnhart,* 73 Wn.2d 936, 942, 442 P.2d 959 (1968); *State v. Marten,* 73 Wn.2d 898, 441 P.2d 520 (1968).

Here, the physical evidence is clear. After forcing the intruders to lie down, Hansen was alone in the room with them. Bigelow had been kicked several times, and all parties agree he was moving somewhat and talking. Bigelow lay on the floor with both hands under his head. Hansen leaned over him, the cocked gun only 3 inches from Bigelow's head, and the gun discharged. We hold as a matter of law no person under these circumstances could have been unaware of the risk that a cocked gun might go off— whether Hansen was bumped, pulled the trigger by accident, or as the prosecution suggested, carried out an execution. No reasonable person could have failed to realize the great risk of causing Bigelow's death under these circumstances. There is no reasonable basis in the record upon which the jury could have found the defendant failed to perceive the risk inherent in his actions. *People v. Strong, supra.*

Second, Hansen's own testimony establishes he knew but disregarded the substantial risk he took. He knew the gun was loaded and would fire once it was cocked. Hansen testified he was afraid the burglars would turn the tables on him. Yet he kicked Bigelow to quiet him, walked between them, and ultimately stood over Bigelow with the gun in close proximity to Bigelow's head. This testimony establishes a knowing acceptance of risk that his conduct might result in injury to someone. He might not have comprehended the possibility that he would shoot Bigelow, but he proceeded, knowingly accepting the risk that there could be a scuffle in which someone might be harmed.

We conclude that under these circumstances no reasonable person could have failed to understand the risk his actions created. The trial court properly refused a second degree manslaughter instruction.

The judgment is affirmed.

McINTURFF, C.J., and GREEN, J., concur.

Reconsideration denied February 2, 1982.

Review denied by Supreme Court April 9, 1982.