574 P.2d 1295

**STATE of Arizona, Appellee,**

v.

**Arnold Ray TUCKER, Appellant.**

**No. 3738.**

Supreme Court of Arizona,
In Banc.

Jan. 30, 1978.
Rehearing Denied Feb. 22, 1978.

Bruce E. Babbitt, Atty. Gen., by William J. Schafer, III, Chief Counsel, Crim. Div., Robert S. Golden, Asst. Attys. Gen., Phoenix, for appellee.

Stephen J. Rouff, Yuma, for appellant.

STRUCKMEYER, Vice Chief Justice.

Appellant, Arnold Ray Tucker, was convicted after trial by jury of one count of first degree murder, two counts of kidnapping, and one count of robbery. He was sentenced to life imprisonment without parole for 25 years on the conviction for murder and appeals.

The evidence established that Tucker had been living in a bedroom of a house owned and otherwise occupied by Linda Shinauld and her husband. On the evening of July 15, 1976, two persons, Harry Seth and Robert Guy, went to the Shinauld residence intending to purchase marijuana from Lester Fenderson, Lex Allen and Russell Caldwell, three friends of Tucker who were waiting at the Shinauld house. The transaction had previously been arranged by Tucker. After Seth and Guy went into the house, Tucker left with Linda Shinauld in her car to go to a neighborhood laundromat. Seth and Guy were assaulted and robbed by

Tucker's three friends. Guy was carried out of the room and a few seconds later Seth heard the sound of a gunshot. Guy was placed in the passenger area of the car in which he had driven with Seth to the Shinauld residence. Seth was then carried out of the house and placed in the trunk of the car, and after a few minutes the car was driven away from the house.

After Seth had been placed in the trunk of the car, but before it was driven away, Tucker walked back toward the house. As he approached the house, he noticed Seth's bound feet handing out of the trunk of Guy's vehicle. Tucker then returned to where he had left the Shinauld vehicle. When he drove back to the house, he saw the Guy vehicle being driven away. Tucker entered the house, called the police and reported a robbery and kidnapping. After the Guy automobile left the Shinauld residence, Seth escaped from the trunk. While he was running, after breaking out of the trunk, he heard a number of shots coming from the car. Some time during the course of these events, Guy was murdered, although it is not certain whether the homicide occurred before or after the car was driven away from the house.

Officer Gary Garrett, patrolman for the Yuma Police Department, arrived in response to Tucker's call. He was invited into the house by Tucker to discuss what had happened and was shown the disarray, which was especially severe in Tucker's bedroom. Tucker first told Garrett that he had been a victim of the robbery. However, Garrett suspicioned that the appellant was involved in the marijuana dealings and read him the *Miranda* rights. No search of the house or appellant's bedroom was made at this time. Later another police officer, Detective Doyne L. Turner, searched the entire house, including Tucker's bedroom. Photographs were taken and certain physical evidence was seized.

■ The State attempts to justify the search on the basis of Linda Shinauld's consent. A warrantless search of property is valid if conducted pursuant to a voluntary consent. *United States v. Matlock,* 415 U.S.

164, 39 L.Ed.2d 242, 94 S.Ct. 988 (1974); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). However, the voluntary consent by a third person to a search of the living quarters of another is valid only if the third person "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974). The Supreme Court clarified its holding with this statement in a footnote:

"Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* n. 7.

Since evidence was seized in Tucker's bedroom, this issue turns on whether Linda Shinauld had "common authority" over that room.

■ The record shows the room was used as sleeping quarters and storage room by Tucker. There is no evidence that it was used for other purposes. Hence, even though Linda Shinauld was an owner of the house, it cannot be said that she had "joint access or control" within the meaning of *Matlock,* supra. Tucker's bedroom was not such a "common area" of the house that it can be said he had assumed the risk that Linda Shinauld might permit it to be searched.

■ The State argues further that appellant's acts of reporting that he was a victim of the crime and inviting Officer Garrett into the house to discuss the crime showed an "implied consent" to search the house. A consent to search may, of course, be

evidenced by conduct as well as by words. However, the constitutional protection against unreasonable searches demands a waiver by unequivocal words or conduct expressing consent. *State v. Tigue,* 95 Ariz. 45, 386 P.2d 402 (1963) (overruled on other grounds by *State v. Harvill,* 106 Ariz. 386, 476 P.2d 841 (1970)). We think the appellant's conduct shows such consent beyond equivocation.

As stated, Officer Garrett, a patrolman, was the first to arrive at the Shinauld residence. Appellant invited Garrett into the house to discuss what had happened and told Garrett that he, Tucker, had been the victim of a robbery. Officer Turner, a detective for the City of Yuma Police Department, thereafter arrived to make an investigation. Mrs. Shinauld admitted Officer Turner to the house. He photographed the entire residence, "mostly the areas that had been ransacked." This included the bedroom occupied by appellant. While Detective Turner saw Tucker there, he did not talk to him. He testified:

"Q. Do you know whether Mr. Tucker ever gave permission to have his particular room searched?

A. No, I didn't ask him.

Q. Do you know whether anyone else may have been led to that room by Mr. Tucker?

A. I believe Officer Garrett was when Tucker pointed out what areas of the house had been ransacked in reporting his alleged kidnapping-robbery.

Q. And that is what Officer Garrett has already testified to?

A. Yes, Officer Garrett took me into the house and showed me what portion of the house had been ransacked."

On cross-examination, Officer Turner testified:

"Q. Am I correct in understanding that when you processed and photographed this room this was prior to the time that Mr. Tucker became a suspect in this case?

A. To my knowledge, yes. At the time I processed it I was under the impression that it was a kidnapping. That is why the house, other rooms of the house were not processed more thoroughly that evening.

Q. So you felt that Mr. Tucker was a victim of a crime?

A. At that time, yes.

Q. When did you change your mind?

A. Later that evening. I believe it was around 9:30, 10:00 o'clock that evening.

Q. That was down at the police station?

A. Yes."

■ To summarize: Appellant called the police and reported a robbery and possible kidnapping. When the first police officer arrived, he was admitted to the house by appellant. When other investigating officers arrived from the Yuma Police Department, they entered the house and appellant's room to investigate the robbery, photographed various areas of the house and seized certain physical objects to that end. No protest whatsoever was made by appellant. Consent is plain on the face of the undisputed facts.

After appellant was arrested, an agreement was made by appellant's attorney and the prosecuting attorney in which it was understood that appellant would take a polygraph examination. It was agreed that the results of the examination would not be admissible in court. The examination was administered to appellant on July 17, 1976. While it was in progress, appellant changed his mind and asked that the polygraph instruments be removed. The examiner then pointed out to appellant that he had done badly and in what respects, and told him that it was obvious that he was not telling the truth. All of the foregoing was excluded from the testimony at appellant's trial.

Later, Detective Turner came into the room and the examiner left. Appellant and Turner then discussed the crime. At that time, appellant told Turner:

" * * * that he had planned the robbery, that he had contacted subjects Fletcher—or correction, not Fletcher, Fenderson, Allen and Caldwell earlier

that day and told them about the marijuana transaction. And since he did not have any marijuana and they did not have any marijuana at that time they planned to rob Seth. They didn't know that Robert Guy would be coming over." (Testimony of Doyne L. Turner.)

Later, Detective Turner asked the polygraph examiner to come back in. When he returned, Turner asked the appellant to tell the examiner what the appellant had told him, Turner. At that time the appellant related to them both that he had "set up the deal, that he had planned the robbery."

■ We do not think it is necessary to determine precisely when the polygraph examination was ended—whether when appellant broke off the examination by having the polygraph equipment removed or whether it was not until the polygraph examiner finally left the room. Clearly, if it was not when appellant refused to continue the examination, it was when the polygraph examiner left the room. At some time during this period the examination terminated. Appellant could not possibly have had any misapprehension as to this. The confession subsequent to the polygraph examination was admissible, even though the results of the examination, itself, would not have been.

■ The appellant urges that the trial court committed reversible error in failing to give his requested instruction that one who has aided and abetted in the commission of a crime may end his responsibility therefor by (1) notifying others of his intention to withdraw from participation in the criminal conduct and (2) by doing everything in his power to prevent the commission of the crime. We have examined the evidence in detail and we find nothing which reasonably suggests that the appellant attempted to withdraw or to prevent the commission of any of the offenses. That appellant was shocked or extremely frightened when he saw the bound feet of Seth dangling from the trunk of the Guy vehicle does not support the suggestion that he attempted to withdraw from the plot to rob Seth, nor does the fact that when he

returned he found his watch and ring were missing from his room, nor that he immediately notified the police by telephone of a possible robbery and kidnapping.

■ Appellant argues that the court erred in refusing to instruct on second degree murder and manslaughter and in submitting the case to the jury only on first degree murder. He seems to be urging that because he only planned a robbery and that the jury could have concluded that he only aided and abetted the robbery and not the kidnapping and murder, it should have been instructed on the lesser degrees of homicide. We think, however, as the State points out, that whatever may have been the appellant's intentions at the time he entered into the scheme to commit robbery, the kidnapping and murder were in terms of the felony murder rule a continuous series of acts emanating from the robbery plan. Whether the death of Guy occurred before or after the robbery at the Shinauld residence or before or after the kidnapping, the murder was a part of a continuous series of events directly flowing from the scheme to commit the robbery. If appellant was guilty of murder, it was under the felony murder rule and any other degree of homicide, whether second or manslaughter, is not supported by the evidence.

■ Finally, appellant questions whether he could be constitutionally tried by an all white jury. As to this, the record discloses that the jury panel was selected according to the normal jury procedure in Yuma County. This was the selection of names at random from the current registered voters lists. Counsel for appellant frankly states that he "seeks to make a record on this argument in view of future appeals and future changes in the law and to avoid a waiver of appellant's objection to his trial by an all white jury." Our discussion in *State v. Williams,* 111 Ariz. 175, 526 P.2d 714 (1974), is dispositive of this issue. There is no indication of systematic black exclusion or racial prejudice in the record. The fact that appellant was tried by an all white jury does not, in itself, give grounds for a claim of error.

Judgment of the Superior Court is affirmed.

HAYS and HOLOHAN, JJ., concurring.

GORDON, Justice (dissenting):

I cannot agree with the majority's characterization of events or legal conclusions and must, therefore, dissent.

Although recognizing that Turner never obtained appellant's permission to search his bedroom, the majority, nevertheless, concludes that appellant's acts of reporting that he was a victim of a crime and showing Garrett around portions of the house amounted to an unequivocal expression of consent to the later search by Turner.

The majority is correct in stating that Officer Garrett was the first policeman to arrive at the house; that appellant invited him into the house explaining that he had been the victim of a robbery, and that Garrett did not make a search of the house at that time. While the record does not indicate precisely how much time elapsed between Garrett's arrival and Turner's later arrival and search of the house, it can be determined from the sequence of events that Turner searched the house sometime between thirty and sixty minutes after Garrett was invited into the house.

In quoting portions of the testimony of Turner, the majority opinion leaves the reader with the impression that Garrett testified that appellant escorted him to his bedroom and pointed out the ransacked condition of the room. Conspicuously absent from the majority opinion, though, is testimony by Garrett himself as to the circumstances under which he viewed the room.

A close examination of the record reveals that Garrett never testified that appellant led him to the back bedroom to show him its condition. In fact, when asked whether he went anywhere in the house other than the living room, Garrett answered uncertainly, "I believe at one point I walked into a rear bedroom area with Mr. Tucker when he got some cigarettes, if I recall right".

I would hold that appellant's acts of calling the police to report that he was the victim of a robbery, inviting Garrett into the living room of the house, and his failure to protest Garrett's following him into the bedroom to retrieve cigarettes fall well short of the required unequivocal expression of consent to the later search by Turner.

After the appellant was arrested and had received his initial appearance, an oral agreement was made between the appellant's attorney, the county attorney and the police polygraph examiner that the appellant would submit to a polygraph examination on July 17, 1976. It was stipulated that the results of the examination would be inadmissible. The appellant alleges, and the state does not argue or offer evidence to the contrary, that the agreement among the parties was that the polygraph examination and the stipulation as to inadmissibility included any statement the appellant would make during the session.

Before the examination was begun, the appellant was informed of his *Miranda* rights and signed a form waiver of those rights. The polygraph examiner, Mr. Bangs, questioned the appellant in detail about his involvement in the planning of the kidnapping and robbery. At one point in the examination, the appellant asked to be released from the attachments of the polygraph instrument. Immediately after releasing the defendant, Bangs informed the appellant that he had registered deceptive. At this point detective Turner, who had not been present during the testing period, entered the examination room. With Turner present, Bangs continued interrogating appellant. After asking a few more questions, Bangs left the room and Turner took over the interrogation. While he was alone with Turner, the appellant made a number of incriminating statements including an admission that he had planned the robbery. All of these statements were admitted at trial.

The appellant contends that the questions by Turner were asked pursuant to the polygraph examination and that appellant's responses are inadmissible by reason of the stipulation. While it is not articulated in

the opinion, the majority apparently agrees with the state's contention that the polygraph examination had terminated by the time appellant made his statements, that the statements were not covered by the stipulation, and that they are therefore admissible because the appellant signed a waiver of his rights.

As a preliminary matter, I would hold as a matter of law that when an accused signs a waiver of his right to remain silent and his right to assistance of counsel to facilitate the taking of a polygraph examination, the waiver is effective only for the duration of the examination. Hence, even if the majority is correct in asserting that the polygraph examination had terminated by the time appellant confessed, the state would have been required to prove more than that appellant signed a form waiver for purposes of taking an examination in order to prove that there had been a waiver at the time of the confession.

I would not decide the issue of waiver exclusively on the basis of the above reasoning, though, because I strongly disagree with the majority's conclusion that appellant could not possibly have had any misapprehension as to whether the polygraph examination had terminated at the time he confessed. Consequently, I would hold that the state has not established that the appellant waived his constitutionally guaranteed right not to incriminate himself. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

To establish a waiver of constitutionally guaranteed rights the state must prove "an intentional relinquishment or abandonment of a known right or privilege". *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). Furthermore, "courts indulge in every reasonable presumption against waiver". *Id.* at 1242.

To prove that an accused has intentionally relinquished his right not to incriminate himself, the state must demonstrate that he was aware that anything he said could be used against him in court. *Cf. Miranda v. Arizona, supra.* Although the form appellant signed contains a sentence to the effect that any statement he made could be used against him, it must be recognized that there was an overriding understanding among the parties that much of what the defendant was about to say could *not* be used against him. When such an understanding is juxtaposed with a signed waiver, a defendant will invariably be confused as to which of the statements he is about to make can ultimately be used against him and which cannot. Moreover, because of the nature of the agreement among the parties,[1] it is quite possible that the appellant assumed that the stipulation as to inadmissibility completely negated his signed recognition that anything he said could be used against him in court.

There is a great deal of confusion among the parties as to what constitutes a polygraph examination. The state contends that a polygraph exam is limited to interrogation while the subject is connected to the polygraph instrument. The state's polygraph expert, however, testified that a polygraph exam includes both a pre and post test period of questioning. Of course, while the state's differing notions of what a polygraph examination consists of are irrelevant to a determination of whether the appellant knowingly waived his right not to incriminate himself, the confusion does serve to illustrate my view that the appellant cannot be charged with having known whether, at any given moment, the polygraph examination had terminated and the waiver he had previously signed "reattached" to the statements he was about to make.

Even if the majority is correct in concluding that appellant was aware that the polygraph examination had terminated at the time he made his admissions, I would, nevertheless, hold that the statements were taken in violation of appellant's Sixth Amendment right to the assistance of coun-

1. As I stated above, the state did not controvert appellant's contention that the agreement among the parties was that the polygraph examination and stipulation as to inadmissibility extended to *everything appellant would say during the session.*

sel. Essentially my position is that when a party accused of a crime agrees to submit to a polygraph examination after consulting with his retained or appointed attorney, the police may not interrogate that party after the termination of the examination without first obtaining the permission of the accused's attorney.

Of course, it is elementary that an accused has the right to the assistance of counsel at any time after judicial proceedings have begun against him. *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). It is also well settled that once a defendant is advised of his right to counsel, he may waive that right and make a voluntary confession. *Miranda v. Arizona, supra.* In order to counteract the "inherently coercive" atmosphere of a police interrogation at the stationhouse, the court in *Miranda* stated "If, however, he indicates *in any manner* and at any stage of the process that he wishes to consult an attorney before speaking there can be no questioning". (Emphasis added.) *Miranda v. Arizona,* 384 U.S. at 443, 86 S.Ct. at 1612.

While I recognize that many of the concepts articulated in the *Miranda* opinion have been substantially eroded by subsequent case law, the proposition that an accused has the right not to be interrogated after any assertion of his right to counsel has been reaffirmed as recently as 1977 by both the Arizona and U.S. Supreme Courts. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *State v. Mincey,* 115 Ariz. 472, 566 P.2d 273 (1977); *See also, State v. Edwards,* 111 Ariz. 357, 529 P.2d 1174 (1975). Even in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), where it was held that there was no per se proscription of further interrogation after an accused has indicated a desire to remain silent, the court was careful to distinguish between an assertion of the right to remain silent and an assertion of the right to counsel and to exclude the latter right from its discussion.

To be contrasted with the cases cited above, is a separate line of cases holding that an accused may waive his right to counsel and make a voluntary confession without notification to his already appointed or retained counsel. *State v. Richmond,* 23 Ariz.App. 342, 533 P.2d 553 (1975); *State ex rel. Berger v. Superior Court,* 105 Ariz. 553, 468 P.2d 580 (1970). *Reinke v. United States,* 405 F.2d 228 (9th Cir. 1968). However, a close reading of these cases discloses that a statement taken from an accused after he has consulted with counsel is admissible only if the accused volunteers the statement without questioning by the police, or, if interrogation is involved, only if the accused initiates the reopening of the interrogation process by informing the police that he wishes to make a statement, and the accused is given the appropriate *Miranda* warnings at that time.[2] *See also, State v. Moore,* 27 Ariz.App. 275, 554 P.2d 642 (1976); *Brewer v. Williams,* supra, (Powell, J. concurring).

Hence, the law still is that once the right not to be interrogated as to a particular crime has attached, no statement made by the accused in response to questions of the police is admissible if the police, without the permission of the accused's attorney, initiated the interrogation session.

Applying these principles to the facts of this case, appellant asserted his right to the assistance of counsel and, therefore, his right not to be interrogated by consulting with his appointed counsel prior to taking the polygraph examination. As I have stated above, it is my view that when appellant signed a waiver of his rights to facilitate the taking of a polygraph examination, that waiver was effective only for the duration of the examination. Hence, assuming the

---

**2.** In *State v. Marks,* 113 Ariz. 71, 546 P.2d 807 (1976) and *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976) the defendants were interrogated by the police after they had been appointed counsel. Their statements were ruled admissible even though the respective defendants did not initiate the reopening of the interrogation process. These cases are distinguishable, however, for the reason that the interrogation in each case was limited to crimes unrelated to those for which counsel had been appointed.

majority is correct in concluding that the polygraph examination had ended by the time Bangs left the interrogation room, appellant's right not to be interrogated as to the burglary and robbery without the permission of his attorney was re-established before Turner began his interrogation. The appellant did not initiate that interrogation process by advising Turner that he wanted to make a statement. He was not given the appropriate *Miranda* warnings and the interrogation was conducted without the permission of appellant's attorney. Consequently, no statement made by appellant during that session should have been admitted.

In conclusion, my view of this issue is that the police, with the approval of appellant's attorney, were successful in separating the appellant from his attorney and isolating him in the "coercive atmosphere" of an interrogation room for the limited purpose of conducting a polygraph examination. I simply cannot countenance their conduct in seizing upon appellant's legitimately procured isolation from his attorney to interrogate him immediately after the polygraph examination terminated without first informing his attorney of their intent to do so.

CAMERON, Chief Justice (dissenting):

I join the dissent of Justice GORDON insofar as it relates to the admission of statements made by the defendant during and immediately after the polygraph examination.