675 P.2d 686

**STATE of Arizona, Appellee,**

v.

**Warren Wesley SUMMERLIN, Appellant.**

**No. 5612.**

Supreme Court of Arizona, In Banc.

Nov. 21, 1983.

Reconsideration Denied Jan. 17, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, and Jessica Gifford Funkhouser, Asst. Attys. Gen., Phoenix, for appellee.

Kemper & Henze by James Hamilton Kemper, Phoenix, for appellant.

CAMERON, Justice.

Defendant, Warren Wesley Summerlin, was tried before a jury and convicted of first degree murder, A.R.S. § 13–1105, and sexual assault, A.R.S. § 13–1406. The defendant was sentenced to death for the murder, A.R.S. § 13–703, and to twenty-eight years for the sexual assault, both sentences to be served consecutively. An

automatic appeal to this court followed pursuant to Rules 26.15, 31.2(b), Arizona Rules of Criminal Procedure, 17 A.R.S.; we have jurisdiction pursuant to Art. 6, § 5(3) of the Arizona Constitution, and A.R.S. §§ 13–4031 and 13–4035.

The issues we must decide on appeal are:

I. Was defendant's motion to suppress evidence obtained pursuant to a search warrant properly denied?

II. Did the trial court improperly comment on the evidence in front of the jury?

III. Was the trial court's admission into evidence of eight autopsy photographs of the victim erroneous?

IV. Was the defendant's anti-marital fact privilege violated?

V. Does defendant have a right to a jury determination of factual questions that lead to imposition of the death penalty?

VI. Is the Arizona death penalty statute unconstitutional because it fails to provide guidance for weighing and balancing aggravating and mitigating circumstances?

VII. Does this court find in its independent review that the death penalty was appropriate in this case?

VIII. Is the death penalty in this case proportionate to the disposition of other similar cases?

The facts necessary for a resolution of these issues are as follows. At approximately 8:30 a.m. on 29 April 1981 the victim left her place of business (Finance America) in Tempe, Arizona. The victim was a delinquent-account investigator, and was occasionally required to personally visit the residences of persons whose accounts were delinquent and who could not be reached by phone. On this particular day, her agenda included visits to two residences, the first visit being to the residence of defendant, Warren Summerlin. Upon completing a visit, the victim routinely called back to Finance America and notified her superior of her whereabouts. On this particular day Mr. Buchanan, the victim's superior, never received such a call.

Marvin Rigsby, the victim's boyfriend, typically spoke with the victim several times during the day while she was at work. When he called Finance America and learned that she had not returned or called the office after leaving that morning, he asked for and received from Mr. Buchanan the addresses that the victim was supposed to visit that day. Mr. Rigsby arrived at defendant's house at approximately 5 p.m. and spoke with the defendant. Mr. Rigsby described the victim and asked the defendant if anyone resembling her had visited defendant that day. Defendant answered affirmatively, stating that the victim left his house at approximately 10:30 a.m. After leaving defendant's residence, Mr. Rigsby drove to the second address. The woman residing at this address told Mr. Rigsby that she had been home all day, and had not received a visit from anyone. That evening Mr. Rigsby relayed the preceding information to the police.

That same evening, Officer Brunk received an anonymous "Silent Witness" call concerning the present case. The female caller stated that she had information concerning the woman from "Pacific Finance Company" who was reported missing. The caller further stated she thought that this woman had been killed by Warren Summerlin, who resided at 3342 West Willetta in Phoenix, and that Mr. Summerlin had rolled up the victim's body in a carpet. The caller was later identified as the defendant's mother-in-law.

At approximately 5 a.m. the next day, Mr. William Goodman was working at the "Low Cost Market" at 35th Avenue and Van Buren in Phoenix. At this time, a road paving crew directed his attention to a brown Mustang car parked in the parking lot of Mr. Goodman's store. Mr. Goodman, who had served in Vietnam, went outside to observe the car and recognized the odor

of a decaying body. He also observed a pair of women's panties and shoes lying on the backseat of the car. Mr. Goodman walked back to his store and called the police.

Detective Klettlinger arrived at the parking lot to investigate. He forced open the lock of the trunk of the brown Mustang, later identified as the victim's car, and found the victim's dead body rolled up in a bedspread. The bedspread was covered with blood and contained green carpet tufts, sponge padding, and long red hairs. A piece of bloody plastic was also found with the body. The victim was nude from the waist down, and Detective Klettlinger observed a white milky substance on her genitalia.

Based upon the above information, Officer Davis of the Phoenix Police Department obtained a search warrant which was served at defendant's residence by Detective Klettlinger at approximately 5:30 p.m. on 30 April 1981. After serving the warrant, Detective Klettlinger seized carpeting and padding from inside the house, bloody men's boots and a hoe with hair on it resting by a door outside the house, and a bloody child's reader and bloody floor tiles in a garbage can outside the house.

Detective Fuqua, also of the Phoenix Police Department, accompanied Detective Klettlinger during the search of defendant's residence. Detective Fuqua read the search warrant to defendant, and the defendant said, "I didn't kill nobody." Detective Fuqua did not reply, and defendant asked, "Is this in reference to the girl that was at my house?" Detective Fuqua asked, "What girl?", and the defendant stated "the lady that came to the house about 10:00 in the morning, reference to [my] wife's piano." The defendant was then advised of his rights, and indicated he understood these rights. During this time, defendant's wife identified the bedspread found with the victim as belonging to the Summerlin household.

Detective Klettlinger again advised defendant of his rights, arrested defendant, and transported him to the main Phoenix police station. At the police station, defendant asked to speak with his wife, and Detective Fuqua arranged this meeting. When Mrs. Summerlin arrived, Detectives Fuqua and Martinsen were present in the interviewing room. Defendant requested a private conversation with his wife, and Detective Fuqua told him this was impossible. While the detectives remained in the interviewing room, defendant proceeded to make several incriminating statements to his wife. After returning Mrs. Summerlin to her home at approximately 8:05 p.m., Mrs. Summerlin gave Detective Martinsen permission to further search the residence. Detective Martinsen seized some men's clothing that had been soaking in a bathtub and a towel was also seized. Mrs. Summerlin told Detective Martinsen about these items before they entered the house.

The defendant was tried and convicted by a jury and now appeals.

## EVIDENCE FOUND PURSUANT TO SEARCH WARRANT

 The affidavit in support of the warrant read in part:

IN SUMMARY, [THE VICTIM] was last known to have gone to 3342 West Willetta on a delinquent account for FINANCE OF AMERICA. She was to contact a MR. & MRS. SUMMERLIN who [lived] in the rear house at this address. [THE VICTIM] never showed up at her next appointment at 3843 West Abraham. A W/M at 3342 West Willetta (rear house) identified himself as the husband of MRS. SUMMERLIN. He said that [THE VICTIM] had contacted him at approximately 10 a.m., that morning, April 29, 1981, and had left. Silent Witness Call # 1594 advised that the SUSPECT is a WARREN SUMMERLIN, W/M, 32-35 years, and he may have killed the VICTIM. The VICTIM['S] body was found in the locked trunk of her car in the west parking lot at 3442 West Van Buren. Her keys, purse and credit cards are missing. The VICTIM was wrapped in a white plastic bed-liner cover, bed sheet or water bed liner. She had apparently

been killed at another location, placed in the trunk of her car and driven to 3442 West Van Buren.

Defendant contends that the warrant was based on an anonymous tip and controlled by the "two-pronged" test established by the United States Supreme Court's decisions in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). We need not rely, however, upon the anonymous tip, as we believe that there were sufficient facts without the anonymous tip upon which to base a valid warrant. We agree, however, that an informant who contacts the police through the Silent Witness program commands a greater expectation of reliability than the average police informant. *State v. Turney,* 134 Ariz. 238, 241, 655 P.2d 358, 361 (App.1982); *State v. Collins,* 21 Ariz.App. 575, 578, 522 P.2d 40, 43 (1974). Unlike the usual police informant who frequently seeks some favor from the police in return for his information, the silent witness generally wants nothing in return for his or her tip. Absent other evidence as to the corrupt motive of the anonymous caller, such an informant is considered reliable and credible. *Turney;* and *Collins,* supra.

Concerning probable cause, the Ninth Circuit Court of Appeals has stated that:

affidavits are to be interpreted in a common sense and realistic manner, * * * and * * * probable cause exists when the facts and circumstances shown in the affidavit would warrant a man of reasonable caution in the belief that the items to be seized were in the stated place, * *.

*United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir.1970). When evaluating an affidavit, "[a] search warrant may not be issued unless the issuing magistrate has probable cause to believe a crime was committed * * *." *State v. Berge,* 130 Ariz. 135, 136, 634 P.2d 947, 948 (1981) (citation omitted). See also *United States v. Ventresca,* 380 U.S. 102, 108–09, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965) (cited in *Berge,* supra, with approval); *State v. Hale,* 131 Ariz. 444, 446, 641 P.2d 1288, 1290 (1982).

In the instant case, probable cause existed to believe that the victim's missing keys, purse, and credit cards might be found at the defendant's residence. A missing person report on the victim had been filed by Mr. Rigsby, stating that the victim had left her office that morning to call on the Summerlin residence, and had not been heard from again. Her employer, Mr. Buchanan, verified that it was customary for the victim to call the office after completing a call on a delinquent account and that the victim did not do this during the morning in question. Mr. Rigsby visited the house where the victim was to make her second call of the day, and was told by the occupant that the victim had never arrived at the house. The body of the victim had been found, and murder was unquestionably the cause of her death. We believe there was indeed probable cause to issue a warrant to search defendant's residence, even without the anonymous call.[1]

Defendant contends further that the court should have suppressed the items retrieved from defendant's bathroom after defendant was taken to the police station. These items were found by the police after defendant's wife consented to a further search of the house. We have stated that:

It is well settled that a warrantless search of property is valid if conducted pursuant to a voluntary consent. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *State v. Tucker,* 118 Ariz. 76, 78, 574 P.2d 1295, 1297 (1978), *cert. denied,* 439 U.S. 846, 99 S.Ct. 144, 58 L.Ed.2d 147 (1978). "A consent to search may be evidenced by conduct as well as by words. However,

---

1. We therefore do not consider the applicability of *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Although Gates is applicable to search warrants obtained after the date of its issuance (8 June 1983), the opinion is silent as to whether it should be applied retroactively.

the constitutional protection against unreasonable searches demands a waiver by unequivocal words or conduct expressing consent." *State v. Tucker, supra,* 118 Ariz. at 78–79, 574 P.2d at 1297–98. These same principles apply where the consent is given by one who possesses common authority over the premises or effects. In such a situation, the consent is valid as against the absent, nonconsenting person with whom that authority is shared. *United States v. Matlock, supra,* 415 U.S. at 171, 94 S.Ct. at 993.

*State v. Schad,* 129 Ariz. 557, 563, 633 P.2d 366, 372 (1981). Accord, *United States v. Long,* 524 F.2d 660, 661 (9th Cir.1975); *Yuma County Attorney v. McGuire,* 111 Ariz. 437, 438, 532 P.2d 157, 158 (1975). The wife had common authority over the house, and her consent was valid against the defendant. *State v. Schad,* supra. We find no error.

## "COMMENTING" ON THE EVIDENCE

During jury selection, the following transpired:

THE COURT: * * * As you heard me call the case it's entitled the State of Arizona versus Warren Wesley Summerlin. This is a criminal case, in which the defendant is accused by the State of Arizona of, on the date of April 29th, 1981, having sexually assaulted and murdered [the victim].

Have any of you heard about this case, formed any opinions about it, or heard about it by any information on the news media?

I might again say that this will be the first time that I'm hearing the facts, just as it will be the first time that you folks are hearing the facts. But as I understand, and counsel can correct me, it has been in the news media before.

It concerned, I believe, a collection agent or a bill collector, who was the decedent, and the attempt by her to go out to the defendant's residence, and at that time the incident took place.

Is that basically, as a very rough sketch, just to give the jury an idea where we are at?

MS. GIFFORD: That's close, Your Honor.

THE COURT: Counsel, is that fair, Mr. Klink?

MR. KLINK: Well, may we approach the bench?

THE COURT: Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

MR. KLINK: Sorry to break this up here, Your Honor. I believe you've related some facts that are not in the indictment, and I believe that is an improper comment on the evidence.

THE COURT: What facts are those?

MR. KLINK: Well, those were that the bill collector had gone out to the defendant's home to collect a bill. And while there may or maybe be testimony about that. I believe it is a comment on the evidence, and on that basis I would move for a mistrial at this point in time.

THE COURT: I'll deny your motion. * *

&ast; &ast; &ast; &ast; &ast; &ast;

(The following proceedings were held in open court in the presence of the jury.)

THE COURT: As I indicated, the event took place at 33—or was alleged to have taken place at 3342 West Willetta.

Are any of you aware or familiar with this incident or have heard about it or read about it in the media?

Defendant alleges that these statements made by the trial judge to the jury were improper comments concerning disputed evidence. Under our state Constitution, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law. No cause shall be reversed for technical error in pleadings or proceedings when upon the whole case it shall appear that substantial justice has been done." Ariz. Const. Art. 6, § 27. We have stated that:

The purpose of Art. 6, § 27 is to prohibit the judges from expressing their opinion as to evidentiary matters. The constitutional provision does not forbid a trial court from making reference to the evidence, but it does forbid comment. The word comment as used in the constitutional provision has been construed to mean the expression of opinion.

*State v. Barnett,* 111 Ariz. 391, 393, 531 P.2d 148, 150 (1975) (citations omitted). *E.g., State v. Britson,* 130 Ariz. 380, 385, 636 P.2d 628, 633 (1981); *State v. Barnes,* 124 Ariz. 586, 590, 606 P.2d 802, 806 (1980).

■ Defendant first contends that the trial judge's statement that, "It concerned, I believe, a collection agent or bill collector, who was the decedent, and the attempt by her to go out to the defendant's residence, and at that time the incident took place," constituted a comment on the evidence. We do not agree. The judge was not commenting on the evidence, but was giving the jury a factual background in order to determine whether any of the jurors should be excluded from jury duty. For such purpose, some statement of the facts is necessary. The judge did not indicate that the victim did visit, but rather he "believe[d]" and she "attempted" to visit. While "alleged attempt" might have been better phrasing than just the word "attempted" used alone, we do not find that this indicated to the jury an opinion by the court that the victim did, in fact, visit the defendant's residence, and we find no prejudice to the defendant.

■ Secondly, the defendant alleges that the statement "As I indicated, the event took place at 33—or was alleged to have taken place at 3342 West Willetta" was also a comment on the evidence. We cannot agree that the words "the event took place at," which were immediately changed to, "was alleged to have taken place at" as soon as they were spoken, so prejudiced the minds of the jury that they were precluded from acting impartially towards defendant. Even if this statement could be considered a comment on the evidence, such "comment" was negated by the words

which followed, and the resulting error, if any, was not prejudicial.

## ADMISSION INTO EVIDENCE OF AUTOPSY PHOTOGRAPHS

■ Defendant alleges that eight autopsy photographs of the victim were admitted into evidence solely to prejudice the jury. The photographs show various gashes to the victim's skull, and none of the photographs were repetitive. We have stated that:

> [G]ruesome or inflammatory evidence may be admitted if it is material to some aspect of the case. * * * In such circumstances, the trial court must determine whether the probative value of the evidence outweighs its potential to prejudice the jury.

*State v. Gerlaugh,* 134 Ariz. 164, 169, 654 P.2d 800, 805 (1982), supplemented in 135 Ariz. 89, 659 P.2d 642 (1983) (citations omitted). *E.g., State v. Hicks,* 133 Ariz. 64, 69, 649 P.2d 267, 272 (1982); *State v. Schad,* 129 Ariz. 557, 571–72, 633 P.2d 366, 380–81 (1981); *State v. Steele,* 120 Ariz. 462, 464, 586 P.2d 1274, 1276 (1978). Gruesome photographs are properly admissible for a variety of reasons. We have stated that:

> In *State v. Thomas,* 110 Ariz. 120, 515 P.2d 865 (1973), we identified the following uses for which photographs of a corpse may be admitted in a homicide prosecution: to prove the corpus delicti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed. *Id.* at 130, 515 P.2d at 875.

*State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983). *E.g., State v. Gerlaugh,* supra, 134 Ariz. at 169, 654 P.2d at 805; *State v. Hicks,* supra, 133 Ariz. at 69, 649 P.2d at 272; *State v. Schad,* supra, 129 Ariz. at 571–72, 633 P.2d at 380–81. The State argues that the pictures were admitted to show premeditation and to help one of the State's witnesses explain his testimo-

ny. The trial court agreed with the State, and we will not disturb such a ruling on appeal unless the trial court has clearly abused its discretion. *State v. Gerlaugh,* supra, 134 Ariz. at 169, 654 P.2d at 805. *Accord, State v. Ferrari,* 112 Ariz. 324, 333, 541 P.2d 921, 930 (1975). After reviewing the record and viewing the photographs, we find that none of the autopsy photographs introduced at trial were repetitive, and each illustrated an important piece of evidence when considering the issue of premeditation. The state's witness testified that any one of the blows to the victim's head was sufficient to kill the victim, yet numerous, deep lacerations were evident from the photographs. We believe defendant's excessive and purposeful actions demonstrate more than just a "reactionary" homicide. The photographs were a visual record of defendant's intent, were relevant as to defendant's premeditation, and were properly admitted at trial. Additionally, the state's witness testified that the pictures were a helpful testimonial aid. In light of the above, we hold that the trial court did not abuse its discretion in admitting the photographs.

## ANTI-MARITAL FACT PRIVILEGE

██ Detective Fuqua gave the following testimony at trial:

[Detective Fuqua]: When Mr. Summerlin's wife came into the room she sat down next to me, putting her directly across from him. And he made a statement "I knew this had to happen."

\* \* \* \* \* \*

His wife responded "What do you mean?" And he then stated "This was the big crime."

\* \* \* \* \* \*

His last statement he stated was, quote, "I don't like to pay bills and all the other bullshit," unquote.

\* \* \* \* \* \*

Then he told her just prior to the end of the interview, that—not for her to

worry, because the police wouldn't find anything in the house.

Defendant asserted that his anti-marital fact privilege was violated when the police officer so testified. The relevant statute read in pertinent part:

A person shall not be examined as a witness in the following cases:

1. A husband for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, *during the marriage or afterwards,* be, without consent of the other, examined as to any communication made by one to the other during the marriage \* \* \*. [Former] A.R.S. § 13–4062.

This statute prevents the calling of one spouse to testify against the other; it does not apply to conversations between husband and wife that are overheard by a third party. Because defendant asked for privacy, which was expressly denied by the police, defendant asserted that everything he said during the conversation with his wife at the police station was privileged. We do not agree. Defendant Summerlin was warned by the police officers that he could not meet privately with his wife. Since the officers stood in the same room with defendant and his wife, defendant should have known that he risked the officers hearing part or all of his conversation. We have previously ruled on this issue in a case with a fact situation very similar to the present case:

Officer Smith testified to a conversation he overheard between defendant and his wife while in the Sheriff's office. \* \* [The officer] overheard Mrs. Narten say to the defendant: "Karl, you must tell me the truth" to which the defendant replied: "What do you want to do, send me to the gas chamber?" It is argued that Officer Smith's testimony was admitted in violation of the anti-marital fact privilege. [Former] § 13–1802 A.R.S. In *De-Leon v. Territory,* 9 Ariz. 161, 80 P. 348 this court held that the defendant waived the privilege when he wrote a letter from jail to his wife knowing that

the jailer would read it. Communications between husband and wife are generally not confidential when made in the presence of a third person. Rather, the husband and wife are incompetent witnesses.

*State v. Narten,* 99 Ariz. 116, 124, 407 P.2d 81, 87 (1965). *Accord, Narten v. Eyman,* 460 F.2d 184, 191 (9th Cir.1969) (upholding *State v. Narten,* supra). Defendant further contends, however, that the case of *State v. Barnhart,* 73 Wash.2d 936, 442 P.2d 959 (1968), supports his position. We do not agree. In Barnhart, the court stated:

> Another error is directed against the admission of a statement made by appellant to his wife, over the sheriff's telephone, in the presence of the sheriff's secretary. There was no testimony that the appellant objected to talking to his wife in the presence of the secretary. He saw her sitting across the desk from him when the telephone connection had been made. A statement in the presence of a third person, by a husband to his wife, loses its privileged character. If the communication is heard by a third person, even if an eavesdropper, the third person may testify to it, since the privilege protects only successful confidences. (citation omitted) Consequently, the statement made, as related by the sheriff's secretary, was properly admissible.

*Id.* 442 P.2d at 961–62. We hold that defendant's anti-marital fact privilege was not violated.

## IMPOSITION OF THE DEATH PENALTY UNDER A.R.S. § 13–703

Defendant next alleges that our state death penalty statute, A.R.S. § 13–703, is unconstitutional because it requires that the trial judge determine whether to impose the death penalty. Within the last decade, the United States Supreme Court has addressed this issue:

> The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than the jury. This Court has pointed out that jury sentencing in a capital case can perform an important societal function, *Witherspoon v. Illinois,* 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775 [n. 15], 20 L.Ed.2d 776, [783] (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.

*Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913, 922–23 (1976) (footnote omitted). We have expressly followed the mandate of Proffitt in rejecting similar arguments that there is a right under the Sixth Amendment of the United States Constitution to have a jury participate in the capital sentencing decision. *State v. Gretzler,* 135 Ariz. 42, 56, 659 P.2d 1, 15 (1983) and cases cited therein. See also, *Richmond v. Cardwell,* 450 F.Supp. 519, 523 (D.Ariz.1978); *State v. Lambright,* 138 Ariz. 63, 673 P.2d 1 (1983). We find no error.

## WEIGHING AND BALANCING AGGRAVATING AND MITIGATING CIRCUMSTANCES UNDER A.R.S. § 13–703

Defendant further attacks A.R.S. § 13–703, stating that the statute does not provide uniform standards for weighing and balancing aggravating and mitigating circumstances, resulting in arbitrary and capricious imposition of the death penalty. We disagree with the defendant for the reasons set forth in *State v. Gretzler,* supra, 135 Ariz. at 53–55, 659 P.2d at 12–14. *Accord, State v. Lambright,* supra, 138 Ariz. at 63, 673 P.2d 1.

## INDEPENDENT REVIEW CONCERNING AGGRAVATING AND MITIGATING CIRCUMSTANCES

Under A.R.S. § 13–703, this court is required to conduct an independent

review of the trial court's decision concerning the balancing of aggravating and mitigating circumstances. *State v. Gretzler*, supra, 135 Ariz. at 57, 659 P.2d at 16. We have done so and conclude that the trial court correctly found two aggravating circumstances and no mitigating circumstances sufficient to call for leniency. The two aggravating circumstances were that the defendant had previously been convicted of a felony in the United States involving the use or threat of violence on another person, A.R.S. § 13–703(F)(2), and that the defendant committed the offense in an especially heinous, cruel, or depraved manner. A.R.S. § 13–703(F)(6). As concerning this second circumstance we have stated that, "cruelty involves the pain and distress visited upon the victims, and that heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions." *State v. Gretzler*, supra, at 51, 659 P.2d at 10. Evidence of the victim's bruised hand indicates that she attempted to ward off blows. This evidence and the evidence of rape are indications of physical and mental pain. These acts constitute cruelty. As for defendant's state of mind, we must consider such things as defendant's "apparent relishing of the murder," "inflicting of gratuitous violence on the victim," "needless mutilation of the victim," and "senselessness of the crime, and helplessness of the victim." *State v. Gretzler*, supra, at 52, 659 P.2d at 11. We find that all of the above-listed circumstances were present. The coroner who conducted the autopsy on the victim's body stated at trial that the several blows to the victim's head were far more in number than those needed to kill her. It is obvious from the battered condition of the victim's body that she was incapable of defending herself. We find that two aggravating and no mitigating circumstances were present in this case, and that the death penalty is appropriate under A.R.S. § 13–703.

## PROPORTIONALITY REVIEW

We must also consider whether imposition of the death sentence in this case is proportionate to imposition of the death sentence in similar cases. *State v. Gretzler*, supra, at 58, 659 P.2d at 17, and cases cited therein. One similar case is *State v. Jeffers*, 135 Ariz. 404, 661 P.2d 1105 (1983), where defendant lured an ex-girlfriend to his motel room by offering her heroin. The victim was given an overdose of heroin and passed out. She was then strangled and given another heroin injection. Defendant then beat the victim's dead body. *Id.* at 412, 661 P.2d at 1113. This court found that although the crime was not cruelly committed, it was committed in a heinous and depraved manner, and that the death penalty was properly imposed. *Id.* at 428–30, 661 P.2d at 1129–31. Another similar case is *State v. Zaragoza*, 135 Ariz. 63, 659 P.2d 22 (1983). There, defendant attempted to or did sexually assault the victim, and then murdered her by hitting her several times in the head with a blunt object. *Id.* at 65, 659 P.2d at 24. Two aggravating circumstances were found: two prior convictions of felonies involving the use or threat of violence, and a heinous or depraved mental state on defendant's part during the murder. Again, we upheld imposition of the death penalty. *Id.* at 69–71, 659 P.2d at 28–30.

Additionally, we have considered cases where the death penalty was reduced to life imprisonment, and find that the facts were significantly different from the facts in this case. See *State v. Lujan*, 124 Ariz. 365, 604 P.2d 629 (1979) (victim's death not committed in heinous, cruel or depraved manner, so no aggravating circumstance found); *State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979) (death penalty reduced to life imprisonment due to mitigating circumstance).

We have examined the entire record for fundamental error pursuant to A.R.S. § 13–4035 and find none.

Defendant's convictions and sentences for sexual assault and first degree murder are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.