SUPREME COURT OF ARIZONA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-99-0438-AP |
| Appellee, | ) | |
| | ) | Maricopa County Superior |
| v. | ) | Court |
| | ) | No. CR-98-003520 |
| JOHN EDWARD SANSING, | ) | |
| | ) | |
| Appellant. | ) | **S U P P L E M E N T A L** |
| | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court of Maricopa County
No. CR-98-003520
The Honorable Ronald S. Reinstein, Judge

**DEATH SENTENCE AFFIRMED**

_____

Janet A. Napolitano, Former Arizona Attorney General      Phoenix
Terry Goddard, Arizona Attorney General
    by      Kent E. Cattani, Chief Counsel,
            Capital Litigation Section
    and     Robert L. Ellman, Assistant Attorney General
    and     James P. Beene, Assistant Attorney General
    and     John P. Todd, Assistant Attorney General
    and     Monica B. Klapper, Assistant Attorney General
    and     Bruce M. Ferg, Assistant Attorney General      Tucson
Attorneys for State of Arizona

James J. Haas, Maricopa County Public Defender      Phoenix
    by      Terry J. Adams
    and     Spencer D. Heffel
Attorneys for John Edward Sansing

_____

M c G R E G O R, Vice Chief Justice

¶1       On September 18, 1998, Sansing pled guilty to first

degree murder, kidnapping, armed robbery, and sexual assault. The trial judge conducted a sentencing hearing to determine if any aggravating and mitigating circumstances existed. A.R.S. § 13-703.B (2001).[1] The judge found that the State proved, beyond a reasonable doubt, two aggravating circumstances: (1) Sansing committed the crime in expectation of the receipt of pecuniary gain, A.R.S. section 13-703.F.5; and (2) Sansing committed the murder in an especially cruel, heinous, or depraved manner, A.R.S. section 13-703.F.6. The trial judge found Sansing failed to prove any statutory mitigating circumstances, A.R.S. section 13-703.G., but found Sansing established five non-statutory mitigating circumstances: (1) impairment from the use of crack cocaine; (2) difficult childhood; (3) acceptance of responsibility and remorse; (4) lack of education; and (5) family support. The judge determined that the mitigating circumstances were not sufficiently substantial to outweigh the aggravating circumstances and therefore sentenced Sansing to death. A.R.S. § 13-703.E.

¶2      We affirmed Sansing's convictions and sentences on his direct appeal. *State v. Sansing*, 200 Ariz. 347, 361 ¶ 47, 26 P.3d 1118, 1132 (2001). We struck the pecuniary gain finding, concurred with the trial court's finding of cruelty, and did not address the question of heinousness or depravity. *Id.* at 356, 358 ¶¶ 24, 34,

---

[1]     The legislature has since amended A.R.S. section 13-703. *See* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 1.

2

26 P.3d at 1127, 1129. After independently reweighing the aggravating and mitigating circumstances, we affirmed Sansing's death sentence. *Id*. at 360 ¶ 45, 26 P.3d at 1131.

¶3 The United States Supreme Court vacated the *Sansing* judgment and remanded for further consideration in light of *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002) (*Ring II*). *Sansing v. Arizona*, 536 U.S. 954, 122 S. Ct. 2654 (2002) (mem.). The only issue before this court is whether reversible error occurred when the trial judge sentenced John Edward Sansing to death under a procedure that violated *Ring II*. We conclude that the *Ring II* violation constituted harmless error.

## I.

¶4 In *Ring II*, the United States Supreme Court held that Arizona's former capital sentencing scheme violated the right to a jury trial guaranteed by the Sixth Amendment to the United States Constitution. *Ring II*, 536 U.S. at 609, 122 S. Ct. at 2443. The Court declared that "[c]apital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id*. at 589, 122 S. Ct. at 2432. The Court reversed our decision in *State v. Ring*, 200 Ariz. 267, 25 P.3d 1139 (2001)(*Ring I*), and remanded for further proceedings consistent with its decision. *Ring II*, 536 U.S. at 609, 122 S. Ct. at 2443.

3

¶5          Following the Supreme Court's *Ring II* decision, we consolidated all death penalty cases for which we had not yet issued a direct appeal mandate to determine whether *Ring II* requires us to reverse or vacate the defendants' death sentences. In *State v. Ring*, 204 Ariz. 534, 555 ¶ 53, 65 P.3d 915, 936 (2003) (*Ring III),* we held that we will examine a death sentence imposed under Arizona's superseded capital sentencing statutes for harmless error.[2]  "In cases in which a defendant stipulates, confesses or admits to facts sufficient to establish an aggravating circumstance, we will regard that factor as established."  *Id*. at 563 ¶ 93, 65 P.3d at 944.  As we further explained, "[o]ur harmless error inquiry then focuses on whether no reasonable jury could find that the mitigation evidence adduced during the penalty phase is 'sufficiently substantial to call for leniency.'"  *Id*. (quoting A.R.S. § 13-703.E).

---

[2]     In *Summerlin v. Stewart*, No. 98-99002, 2003 WL 22038399 (9th Cir. Sept. 2, 2003), the court held that the rule announced in *Ring II* applies retroactively to cases on federal habeas review and concluded that a judge's imposition of a death penalty "cannot be subject to harmless error analysis."  *Id*. at *33.  We are not bound by the Ninth Circuit's interpretation of what the Constitution requires.  See *State v. Vickers*, 159 Ariz. 532, 543 n.2, 768 P.2d 1177, 1188 n.2 (1989)(declining to follow a Ninth Circuit decision which held Arizona's death penalty statute unconstitutional because that decision rested on "grounds on which different courts may reasonably hold different views of what the Constitution requires"); *State v. Clark*, 196 Ariz. 530, 533 ¶ 14, 2 P.3d 89, 92 (App. 1999) (same).  Accordingly, we decline to revisit our conclusion that *Ring II* error can be reviewed for harmless error.

¶6     To establish the F.6 aggravating circumstance, the state needs to prove beyond a reasonable doubt only one of the heinous, cruel, or depraved elements. *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983). The term especially cruel refers to the mental anguish or physical pain that the victim suffered prior to death. *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997). Heinousness and depravity encompass the "mental state and attitude of the perpetrator as reflected in his words and actions." *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980).

**A.**

¶7     For the especially cruel element to exist, the trier of fact must find beyond a reasonable doubt that "the victim consciously experienced physical or mental pain prior to death." *Trostle*, 191 Ariz. at 18, 951 P.2d at 883. The victim, however, does not need to be conscious for "each and every wound" inflicted for cruelty to apply. *See State v. Lopez* (*Lopez I*), 163 Ariz. 108, 115, 786 P.2d 959, 966 (1990).

¶8     Sansing's admissions and stipulations, coupled with uncontroverted evidence presented at his sentencing hearing, painted a chilling picture of the events leading to Trudy's death. Admitted and stipulated facts indisputably establish that he

murdered Trudy in an especially cruel manner.[3] The testimony of Sansing's wife Kara and of the medical examiner provide further evidence of the cruelty.

¶9     On February 24, 1998, Sansing called the Victory Assembly Church to request a delivery of food for his family. When that church could not assist him, he called the Living Springs Assembly of God Church and made the same request. In response, Trudy Calabrese delivered two food boxes to the Sansing home. Before Trudy could leave, Sansing grabbed her from behind, threw her to the floor, and bound her wrists and ankles. Using a wooden club, Sansing then struck Trudy on the head with force sufficient to break the club into two pieces. Sansing later dragged Trudy into his bedroom, where he sexually assaulted her. He also stabbed her in the abdomen three times with a kitchen knife. The medical examiner determined the cause of death was multiple stab wounds and blunt force head trauma.

¶10    It took Sansing approximately fifteen minutes to subdue Trudy after first attacking her. Kara Sansing testified that Trudy fought a great deal. The medical examiner observed defensive

_____

[3]     Sansing signed a **statement setting forth a** factual basis, accompanying his guilty plea, which included admissions related to his crimes. Sansing also signed and submitted a stipulation of facts to the trial court. Additionally, Sansing stipulated to the admission of videos and transcripts of police interviews of the Sansing children, as well as statements attributed to the children by Dr. Carol Ainley, who counseled the children after Sansing's arrest.

wounds on Trudy's hands and wrists. Trudy begged the Sansing children to call 9-1-1, but Sansing ordered them to watch television. All four children told police that Trudy prayed for help. Kara's testimony corroborates her children's statements. She testified that before being struck Trudy pleaded, "God, please help me . . . . If this is the way you want me to come home, then I will come home." Trudy's defensive wounds, her pleas for help, and her attempts to resist Sansing's attack leave no doubt Trudy suffered mental anguish as she contemplated her ultimate fate. *See State v. Carriger*, 143 Ariz. 142, 160, 692 P.2d 991, 1009 (1984) (inferring victim's mental distress and uncertainty of fate from pleas for mercy); *State v. Summerlin*, 138 Ariz. 426, 436, 675 P.2d 686, 696 (1983) ("Evidence of the victim's bruised hand indicat[es] that she attempted to ward off blows. . . . [and] indicat[es] of physical and mental pain."); *State v. Lambright*, 138 Ariz. 63, 75, 673 P.2d 1, 13 (1983) (finding the victim suffered mental anguish because evidence showed that the victim was abducted, sexually assaulted, and in fear for her life as shown by her trembling and begging to be released) *overruled on other grounds by Hedlund v. Sheldon*, 173 Ariz. 143, 840 P.2d 1008 (1992).

¶11 Furthermore, after binding and beating Trudy with a club, Sansing dragged Trudy into his bedroom and, by his own admission, raped her "while her arms and legs were bound." Kara testified that Trudy was conscious when Sansing raped her and that she heard

7

Trudy speak during the sexual assault.  The evidence of the rape independently establishes both mental and physical suffering.  *See Summerlin*, 138 Ariz. at 436, 675 P.2d at 696 (finding rape an indication of physical and mental pain).

¶12     Sansing admitted that he struck Trudy on the head with a club.  The medical examiner testified that the blows to the head were substantial, resulting in a tremendous amount of bleeding and would have caused pain.  Sansing also admitted stabbing Trudy in the abdomen with a knife.  The medical examiner observed three stab wounds.  The deepest stab wound measured three and three-quarter inches and formed a criss-cross pattern, which the medical examiner attributed to a twisting of the knife.  This physical finding was consistent with Kara Sansing's testimony that she observed her husband "grinding" the knife into Trudy.  This wound struck both the colon and interior vena cava, causing a hemorrhage within the abdominal cavity.  The other two wounds penetrated Trudy's stomach, large intestine, and kidney.  The medical examiner testified that the stab wounds would have caused pain and would not have resulted in an immediate death.  He explained several minutes had to have elapsed for Trudy to lose the amount of blood that she did.  Accordingly, this evidence also separately establishes beyond a reasonable doubt that Trudy endured physical pain.  *See State v. Salazar*, 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992) (finding murder especially cruel where victim suffered a cranial hemorrhage

8

and broken nose and was strangled with a phone cord).

¶13      Sansing argues, however, that this court cannot conclude beyond a reasonable doubt that a jury would have found the murder especially cruel because the evidence is inconclusive as to whether Trudy was conscious during all portions of the attack. Sansing relies on the medical examiner's testimony that it would be unlikely, although certainly possible, for Trudy to have regained consciousness after being struck on the head.[4]  Kara Sansing testified that Trudy fell unconscious after Sansing struck her on the head with the club, but was conscious when Sansing later raped her.  Sansing contends that his wife's testimony that she heard Trudy speaking during the sexual assault provides the only evidence that Trudy regained consciousness.

¶14      Sansing's argument relies upon his mischaracterization of the evidence.  Sansing's own admissions and stipulations establish that Trudy was conscious during the attack.  In addition, all four Sansing children told the police that Trudy prayed for help.[5]

---

[4]      The State asked the medical examiner whether Trudy could have regained consciousness after being struck with the club.  The medical examiner responded: "Is it possible, yes.  I wasn't there. Is it possible? Yes, but I doubt it."  However, when the State inquired if it was "medically unlikely or impossible" that Trudy had a conversation with Sansing during the sexual assault the medical examiner replied, "Not at all."

[5]      The children's recollections of the precise words Trudy used varied only slightly.  They reported that she said, "Please, God, help me," "God, just help me." "Please, Lord, help me," or "God, help me.  Lord, help me, please."

9

Sansing's ten-year old son told police that Sansing threatened Trudy, "Make a move, I'll hit you in the head." Sansing's son observed Trudy struggling to escape and then Sansing striking her on the head. Moreover, Sansing admitted twice that by the time he returned from moving Trudy's truck, which was after he struck Trudy with the club, she had regained consciousness.[6]

¶15 In addition, Sansing stipulated that a reporter who interviewed him would testify that Sansing told her that, after raping and beating Trudy, he decided to kill her to end her suffering. He told the reporter, "She was suffering. I wanted to end it. . . . I wasn't playing God. I just couldn't handle seeing the condition she was in." Accordingly, Sansing's own admissions and stipulations establish Trudy consciously suffered, both mentally and physically, during the attack.

¶16 Given these facts, we conclude beyond a reasonable doubt that any reasonable jury would have found that Sansing murdered Trudy in an especially cruel manner. The *Ring II* error that resulted from allowing a judge to find this aggravating factor is harmless error.

**B.**

---

[6] In the factual basis for his guilty plea, Sansing admitted that "[w]hen he returned [from moving Trudy's truck], the victim was *still conscious*, alive and tied up with cords." Additionally, in his stipulation of facts, Sansing stipulated that "[w]hen he returned [from moving the truck], the victim had regained consciousness."

10

¶17      The terms especially heinous and depraved describe the defendant's state of mind. *State v. Ceja*, 126 Ariz. 35, 39, 612 P.2d 491, 495 (1980). The trier of fact considers five factors to determine whether the defendant committed the murder in an especially heinous or depraved manner: (1) relishing of the murder by the defendant; (2) infliction of gratuitous violence; (3) needless mutilation; (4) senselessness of the crime; and (5) helplessness of the victim. *Gretzler*, 135 Ariz. at 52, 659 P.2d at 11. The trial judge found gratuitous violence, helplessness, and senselessness.[7]

¶18      The helplessness factor may be present when a victim is physically unable to resist the murder. *See State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995) (finding defendant rendered victim helpless by binding her). Gratuitous violence is violence beyond that necessary to kill. *State v. Rienhardt*, 190 Ariz. 579, 590, 951 P.2d 454, 465 (1997). Helplessness by itself is usually insufficient to find heinousness and depravity. *Gulbrandson*, 184 Ariz. at 67, 906 P.2d at 600. However, helplessness in conjunction with another *Gretzler* factor, such as gratuitous violence, can establish the murder was especially

---

[7]      The trial judge's finding of senselessness was related to his finding that Sansing murdered Trudy in expectation of pecuniary gain. Because we struck the pecuniary gain finding on Sansing's direct appeal, we do not consider the senselessness finding in this harmless error review.

11

heinous and depraved. *Id*. Overwhelming and uncontroverted evidence establishes beyond a reasonable doubt that Sansing inflicted gratuitous violence upon Trudy, a helpless victim.

¶19 Sansing admitted that, as Trudy prepared to leave, he "grabbed her from behind and threw her to the floor." Sansing restrained Trudy by driving one knee into her back and placing the other knee on the floor. He separately bound both her wrists and ankles with electrical cords. He then tied Trudy's wrists and ankles together. No reasonable jury would have failed to conclude that Trudy was helpless to defend herself.

¶20 Admitted, stipulated, and uncontroverted facts also establish that Sansing inflicted gratuitous violence upon Trudy. Sansing's ten-year-old son told the police that as Trudy struggled, Sansing struck her on the head with the club. Sansing employed enough force to break the club into two pieces and lacerate Trudy's scalp. Later, he dragged Trudy into his bedroom and raped her "while her arms and legs were bound." Sansing admitted "[a]t some point the victim was blindfolded and gagged by having a sock placed in her mouth." He eventually stabbed her in the abdomen three times. Trudy was found with ligatures around her neck.

¶21 Trudy suffered severe injuries from her attack. The medical examiner observed swelling and bruises on Trudy's forehead and her left orbital region. Her face and lips were swollen and her frenulum was severed, which the medical examiner attributed to

12

a blunt force trauma to the mouth. The medical examiner also noticed a laceration near Trudy's right ear. The ligatures were affixed to Trudy's neck with tension sufficient to leave two marks. The medical examiner testified that the neck ligatures would have decreased the oxygen flow to and from Trudy's brain. Sansing admitted stabbing Trudy in the abdomen. Kara Sansing observed Sansing "grinding" the knife into Trudy. Collectively, the three stab wounds caused blood and body fluid to enter the abdominal cavity.

¶22 The rape, facial wounds, neck ligatures, gagging, blind-folding, and grinding of the knife constitute violence beyond that necessary to kill. *See State v. Walden*, 183 Ariz. 595, 619, 905 P.2d 974, 998 (1995) (finding bruises on arms and legs, neck and chest injuries, head wound, slash wounds, and strangulation gratuitous violence) *rejected on other grounds by State v. Ives*, 187 Ariz. 102, 927 P.2d 762 (1996); *State v.* Lopez (*Lopez II*), 175 Ariz. 407, 412, 857 P.2d 1261, 1266 (1993) (finding knife wounds to face, sexual assault, gagging, and binding of eyes gratuitous violence); *State v. Harding*, 137 Ariz. 278, 295, 670 P.2d 383, 400 (1983) (finding gagging one of the victims with socks constituted gratuitous violence).

¶23 Given the overwhelming and uncontroverted evidence, we conclude beyond a reasonable doubt that any reasonable jury would have concluded that Sansing inflicted gratuitous violence upon

13

Trudy, who was rendered helpless. No reasonable jury could have failed to find that Trudy's murder was especially heinous.

### III.

¶24 Because Sansing either admitted or stipulated to facts that incontrovertibly established the especially cruel element, and overwhelming and uncontroverted evidence established the heinous nature of the murder, we now focus our harmless error inquiry on whether the mitigating evidence was sufficiently substantial to call for leniency. *Ring III*, 204 Ariz. at 563 ¶ 93, 65 P.3d at 944.

¶25 A defendant bears the burden of establishing mitigating circumstances by a preponderance of the evidence. *State v. Dickens*, 187 Ariz. 1, 24, 926 P.2d 468, 491 (1996). Sansing offered impaired capacity due to drug ingestion and his age as the only statutory mitigating circumstances. A.R.S. § 13-703.G.1, .G.5. The trial court rejected both. We conclude beyond a reasonable doubt that a jury would have found that Sansing failed to establish any statutory mitigating circumstances.

¶26 Drug impairment can be a statutory mitigating circumstance if "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was *significantly* impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13-703.G.1 (emphasis added). Mere evidence of drug ingestion or

14

intoxication, however, is insufficient to establish statutory mitigation.[8] The defendant must also prove a causal nexus between his drug use and the offense. Typically, in those cases in which a defendant established statutory impairment, the defendant presented an expert witness who testified that drugs or alcohol affected the defendant's capacity.[9] Furthermore, "a defendant's claim of alcohol or drug impairment fails when there is evidence that the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm

[8]    *See, e.g.*, *State v. Jones*, 188 Ariz. 388, 400, 937 P.2d 310, 322 (1997) (holding defendant did not establish either statutory or non-statutory impaired capacity because "no testimony establishes, either because of his use of drugs or because he was coming off of the drugs, that the defendant could not appreciate the wrongfulness of his conduct or conform his conduct to the law."); *State v. Jordan*, 126 Ariz. 283, 290, 614 P.2d 825, 832 (1980) (explaining that defendant did not establish the G.1 mitigating circumstance because "[n]ot only is [the evidence] inexact as to defendant's level of intoxication at the time of the crime, it is also devoid of any description of how defendant's intoxication affected his conduct, other than he was 'mumbling.'").

[9]    *State v. Medina*, 193 Ariz. 504, 516, 975 P.2d 94, 106 (1999)(statutory impaired capacity predicated on two expert witnesses who testified that ingestion of alcohol, marijuana, and paint fumes could have significantly impaired defendant's ability to conform his conduct to the law); *State v. Ramirez,* 178 Ariz. 116, 131, 871 P.2d 237, 2512 (1994) (defendant's expert concluded "with reasonable psychological certainty that the defendant's capacity . . . was significantly diminished"); *State v. Stevens*, 158 Ariz. 595, 599, 764 P.2d 724, 728 (1988) (finding of impaired capacity based on two experts' testimony regarding defendant's impaired capacity); *State v. Graham*, 135 Ariz. 209, 213 660 P.2d 460, 464 (1983) (same); *Gretzler*, 135 Ariz. at 57-58, 659 P.2d at 16-17 (concluding defendant's mental capabilities were significantly, but only partially, impaired based on "medical testimony that this continuous use of drugs likely impaired defendant's volitional capabilities").

the defendant's ability to control his physical behavior." *Rienhardt*, 190 Ariz. at 591-92, 951 P.2d at 466-67.

¶27     No reasonable jury would have concluded that Sansing met his burden to establish that his ability to control his behavior or his capacity to appreciate the wrongfulness of his conduct was significantly impaired.  Sansing presented no expert testimony to support his assertion that his use of cocaine impaired either his capacity to control his conduct or his capacity to appreciate the wrongfulness of his actions.  He therefore failed entirely to show any causal nexus between his alleged drug use and impairment.

¶28     Sansing also presented only minimal testimony about his drug use on the day of the murder.  Kara testified that Sansing telephoned her while she was at work at approximately 1:30 p.m. During this conversation, Sansing informed her that he had purchased some crack cocaine.  He told her that he had smoked some of the crack but was saving the rest for her.  Kara testified that she could tell he had ingested the crack from the sound of his voice. She testified that when she returned home from work several hours later, Sansing was not "acting normal."  However, she also testified that Sansing's actions were thought out and that he was not acting as if he were in a trance.

¶29     That evidence is insufficient to establish, by a preponderance of the evidence, that Sansing's capacity to control his behavior was significantly impaired.  First, Kara did not

16

quantify how much crack Sansing used. *Cf. Rienhardt*, 190 Ariz. at 592, 951 P.2d at 467 (relying, in part, on the defendant's failure to provide "even a rough estimate of his level of intoxication" to find the defendant did not establish the G.1 factor). Moreover, no reasonable jury would conclude that Kara's testimony that Sansing was not acting himself was sufficient to establish that his capacity was significantly impaired. *Cf. Jordan*, 126 Ariz. at 290, 614 P.2d at 832 ("Not only is [the] testimony inexact as to defendant's level of intoxication at the time of the crime, it is also devoid of any description of how defendant's intoxication affected his conduct, other than that he was 'mumbling.'").

¶30    Furthermore, Sansing's deliberate actions refute his impairment claim and establish that the drug use did not overwhelm Sansing's ability to control his conduct. *Cf. State v. Poyson*, 198 Ariz. 70, 80 ¶ 34, 7 P.3d 79, 89 (2000) (finding that the defendant's deliberate actions "belie[] the defendant's claim of impairment"); *Rienhardt*, 190 Ariz. at 592, 951 P.2d at 467 (considering the defendant's conscious actions to refute defendant's claim of impairment). Kara testified that Sansing planned to rob the person who delivered the food. Additionally, Sansing contacted two different churches in his attempt to lure an unsuspecting victim to his home.

¶31    Sansing's impairment argument fails on yet another basis. Sansing admitted and stipulated to facts that leave no doubt that

17

he attempted to avoid detection. After beating and hog-tying Trudy, Sansing left and moved her truck away from the apartment. When Pastor Becker called the Sansing home, inquiring about Trudy's whereabouts, Sansing gave him a false address and told him that Trudy never arrived. Additionally, Sansing's ten-year-old son told the police Sansing washed blood from the club that he used to strike Trudy. These steps, which can only be regarded as part of an attempt to avoid detection, negate any possibility that a reasonable jury would find that Sansing's capacity to appreciate the wrongfulness of his conduct was significantly impaired. *See, e.g., Poyson*, 198 Ariz. at 80 ¶ 35, 7 P.3d at 89 (finding that defendant's attempt to conceal the crime indicates he could appreciate the wrongfulness of his actions); *State v. Zaragoza*, 135 Ariz. 63, 71, 659 P.2d 22, 30 (1983) ("The fact that appellant tried to dispose of evidence or instrumentalities suggests that he did appreciate the wrongfulness of his conduct.")

¶**32** Given Sansing's failure to present any evidence sufficient to show significant impairment, this case differs from *State v. Hoskins*, 204 Ariz. 572, 574 ¶ 7, 65 P.3d 953, 955 (2003), and *State v. Pandeli*, 204 Ariz. 569, 572 ¶ 10, 65 P.3d 950, 953 (2003), in which we could not conclude, beyond a reasonable doubt, that a reasonable jury would have failed to have found statutory mental impairment. In both *Pandeli* and *Hoskins*, the defendants

18

presented expert testimony regarding their impairment.[10] *Hoskins*, 204 Ariz. at 574 ¶ 7, 65 P.3d at 955; *Pandeli*, 204 Ariz. at 572 ¶ 10, 65 P.3d at 953. Importantly, in both cases, the experts testified that the defendants' various disorders could have contributed to their conduct. *Hoskins*, 204 Ariz. at 574 ¶ 7, 65 P.3d at 955; *Pandeli*, 204 Ariz. at 572 ¶ 10, 65 P.3d at 953. Thus, both Pandeli and Hoskins met their burden of production. Because the State refuted both Pandeli's and Hoskins' expert testimony, a credibility issue existed. We could not conclude beyond a reasonable doubt that a jury would have assessed Pandeli's and Hoskins' expert testimony as did the judge and thus could not hold the error harmless. Here, in contrast, Sansing failed to meet his burden of production.

¶33 We further conclude beyond a reasonable doubt that any reasonable jury would have rejected Sansing's age as a statutory mitigating circumstance. Sansing was thirty-one when he committed these violent acts. He was a married man and a father of four. No reasonable jury would have accorded his age any mitigating weight.

¶34 Sansing offered his impaired capacity, age, difficult childhood, lack of education, acceptance of responsibility and remorse, potential for rehabilitation/lack of future dangerousness,

---

[10] Hoskins' expert witness testified that he suffered from Bipolar II disorder. 204 Ariz. at 574 ¶ 7, 65 P.3d at 955. Pandeli's expert testified that he suffered from paranoid schizophrenia and post traumatic stress disorder. 204 Ariz. at 572 ¶ 10, 65 P.3d at 953.

family support, and the victim's family's request that Sansing not be sentenced to death as non-statutory mitigating circumstances. Although the trial court did not find that Sansing was significantly impaired within the meaning of A.R.S. section 13-703.G.1, the court did find that Sansing's impairment qualified as a non-statutory mitigating circumstance. For the reasons discussed above, *see supra* ¶¶ 28-31, we find beyond a reasonable doubt that no reasonable jury could have accorded the impairment claim more than minimal weight.

¶35        The court also considered Sansing's difficult childhood, acceptance of responsibility and remorse, lack of education, and family support as a non-statutory mitigating circumstances. The court rejected Sansing's argument that his age, potential for rehabilitation/lack of future dangerousness, and the victim's family's sentencing request constituted non-statutory mitigating circumstances.

¶36        We conclude beyond a reasonable doubt that a reasonable jury would have found the mitigating non-statutory evidence not sufficiently substantial to call for leniency.  Sansing presented evidence that his parents divorced when he was young, that he had basically no relationship with his biological father, and that he did not complete high school and achieved poor grades.  A jury might have concluded that Sansing established a difficult, although not abusive, childhood and lack of education.  Sansing, however,

20

did not demonstrate any causal link between his crimes and his childhood and lack of education. Therefore, a reasonable jury could have accorded these two factors only minimal weight. We assume, for purposes of this opinion, that a reasonable jury would have accorded some weight to Sansing's family's love and support and to the fact that he accepted responsibility for his crime.

¶37 Given the shocking circumstances of this crime, no reasonable jury could have given more than minimal weight to Sansing's argument that he presents no future threat. Sansing presented no evidence to support this claim and instead relied upon the fact that he would be incarcerated. Moreover, no reasonable jury could have accorded mitigating weight to the victim's family's request that he be given a life sentence: A victim's sentencing request is not proper mitigation evidence and therefore a jury could not have considered it. *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 17, 68 P.3d 412, 417 (2003) (A victim's "statements regarding sentencing . . . violate the Eighth Amendment, and therefore are prohibited."); *Trostle*, 191 Ariz. at 22, 951 P.2d at 887 (Victim's recommendation "is irrelevant to either the defendant's character or the circumstances of the crime and is therefore not proper mitigation.").

¶38 The evidence leaves no doubt that Sansing murdered Trudy Calabrese in an especially cruel, heinous, or depraved manner. The brutality of this murder clearly sets it apart from the norm of

21

first degree murders.  Collectively, the mitigating evidence is minimal at most.  We conclude beyond a reasonable doubt that any reasonable jury would have concluded that the mitigating evidence was not sufficiently substantial to call for leniency. Accordingly, we hold the *Ring II* violation constituted harmless error.

## IV.

¶39      For the foregoing reasons, we affirm Sansing's death sentence.

_____
Ruth V. McGregor, Vice Chief Justice

CONCURRING:

_____
Rebecca White Berch, Justice

_____
Michael D. Ryan, Justice

 * Justice Hurwitz took no part in the consideration or decision of this case.

**J O N E S, Chief Justice, dissenting:**

¶40       I respectfully dissent.  In my view, the *Ring II* mandate

22

is clear that this court, by reason of the Sixth Amendment, is not free to affirm as harmless error a determination made solely by the trial judge that sentencing aggravators call for the death penalty.

*See Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002) (*Ring II*).

¶**41**     The Supreme Court, in *Apprendi v. New Jersey*, a non-capital case, observed that an enhancement factor capable of increasing a defendant's sentence beyond the maximum permitted under the jury verdict operates as "the functional equivalent of an element of a greater offense."  530 U.S. at 494, n.19, 120 S. Ct. 2348 (2000).  The Court held that the sentence enhancement violated Apprendi's right to a jury determination on whether he was guilty of every element of the crime with which he was charged, beyond a reasonable doubt.  Thus, where the enhancement factor was determined solely and uniquely by the trial judge, the Court held a Sixth Amendment violation had occurred.

¶**42**     The principle was extended to capital cases in *Ring II* in which the Supreme Court stated "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury."  *Ring II*, 536 U.S. at ___, 122 S. Ct. at

23

2443 (citation omitted).

¶43     *Ring II* thus instructs that under the Sixth Amendment a jury must determine an aggravator which exposes a defendant in a capital case to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone.

¶44     Today the majority concludes, notwithstanding *Apprendi/Ring*, that factual findings by the judge alone on capital aggravators may nevertheless be allowed to stand on the basis that the constitutional violation is harmless.  I disagree.  The right to jury trial under the Sixth Amendment is fundamental, and because total jury deprivation occurred in the phase of Sansing's trial that resulted in the capital sentence, the error cannot be deemed harmless.  Error of such magnitude undermines the very structure of the process.  In light of *Ring II*, I do not believe this court is authorized to speculate on what a jury *might* have done.  We cannot, with propriety, substitute our judgment on factual issues so critical to a defendant facing a possible death sentence.

¶45     Nor can I accept the premise, advanced by the State, that the instant case is controlled or influenced by *Neder v. United States*, 527 U.S. 1, 119 S. Ct. 827 (1999).  *Neder* is a different

24

case.  There, the error stemmed from a jury instruction that failed to provide direction on a prosecutorial issue in the government's substantive case.  But evidence against Neder had been properly introduced on the issue in question, and the jury did deliberate and reach a verdict that necessarily included resolution of that issue.  Moreover, the issue appears to have been uncontested.  Accordingly, the Supreme Court found error, but reviewed it under a harmless standard.  The error was viewed and treated as inconsequential because the jury heard all the evidence and its determinations were predicated on a completed record.  Conversely, in the instant case, the jury neither heard the evidence in support of the aggravating factors nor did the jury deliberate thereon or make the ultimate factual determination that resulted in the defendant's capital sentence.

¶**46**     I would remand the case for jury resentencing, strictly on the basis of the Sixth Amendment violation.  *See also State v. Ring*, 204 Ariz. 534, ___, ¶¶ 105-14, 65 P.3d 915, 946-48 (2003) (Feldman, J., concurring in part, dissenting in part) (*Ring III*).


_____
Charles E. Jones, Chief Justice

25